**TRADERS & GENERAL INS. CO. v. BOYSEN et al.**

**No. 3340.**

Court of Civil Appeals of Texas. Beaumont.

Jan. 13, 1939.

Rehearing Denied Jan. 18, 1939.

B. L. Collins, of Dallas, Thos. J. Hightower, of Liberty, Lightfoot, Robertson, & Gano, of Fort Worth, and Barnes & Barnes of Beaumont, for appellant.

Horace D. Grogan, of Liberty, and Allen, Helm & Jacobs and Percy Foreman, all of Houston, for appellees.

WALKER, Chief Justice.

This is a Workmen's Compensation case. Appellant, Traders & General Insurance Company, was the compensation insurance carrier; T. S. C. Motor Freight Lines, Inc., the employer; and Sherman Leslie Boysen, decd., referred to in the record as "Bud," and "Boysen," the employee. On March 7, 1936, Boysen was directed by his employer to go from Houston to Liberty to lighten the loads of two overloaded trucks, which had been held up by the Highway Patrol because of overloading; Boysen went to Liberty as directed by Martin, président of the employing company. Finding that the officers had left Liberty, instead of transferring part of the loads to the truck which he carried for that purpose he sent the driver with the trucks on to Beaumont without reducing the loads; and instead of returning to Houston later in the night, at about 4 o'clock in the morning he decided to take two of the boys whom he had brought along as helpers, and to drive on to Beaumont. At a point about one and one-half miles east of Devers, Boysen, driving the truck himself, left the highway, and drove across a ditch and on up onto the bank on the other side of the ditch, through the railroad fence, and on across the railroad right of way, to the edge of the railroad track where the car turned over. Boysen was killed and the other boys with him were injured. Mrs. Agnes Boysen, a feme sole, was the mother of the deceased, and the divorced wife of the deceased's father, A. M. Boysen. On the 1st day of April, 1936, Mrs. Boysen filed the following "claim" with the Industrial Accident Board:

"This is to notify you T. S. C. Motor Freight Lines, Inc., & Traders & General

Ins. Co. (Name of employer or association or company with which employee is insured) that I claim compensation from you under the Employers' Liability Act of Texas on account of the death of Sherman Leslie Boysen (Name of deceased employee) on the 7th day of March, 1936, which resulted from injuries sustained on the 7th day of March, 1936, while in the employ of T. S. C. Motor Freight Lines, Inc. (Name of employer)

The place of injury was Devers Beaumont Highway (State name or description of building or place)

Fractured Skull and Fractured Ribs

The cause of death was Resulting in Shock from which he never rallied (Describe cause of injury).

Name and P. O. Address of witnesses in support of claim:—

Give names and P. O. Addresses of the Beneficiaries of the deceased (stating the kinship of each such Beneficiary to the deceased); Mrs. Agnes Boysen (Mother) 5317 Texas, Houston, Texas.

Which of the legal Beneficiaries above named are Minors? State ages none

Length of time employed in same employment previous to date of injury 4½ yrs. (Years, months, or days.)

Wages of deceased employe on date of injury were $25.00 per week (Day, week or month)

Deceased was employed 7 per week (State whether 6 or 7 days).

"This claim for compensation, with respect to such injury and because of the death of deceased, is made in behalf of and for each and all of the legal Beneficiaries of the deceased, as well as by and for the undersigned, he herein acting for himself and such legal Beneficiaries.

 "(Signed) Mrs. Agnes Boysen
 "(Signature of claimant.)
"(Industrial Accident "5317 Texas
 Board) "(Street and number.)
 "State of Texas "Houston, Texas
"(Received Apr 1 1936 "(City or town.)
"Dated this 23 day of March, 1936."

A. M. Boysen, father of the deceased, filed no separate claim. On the 25th day of May, 1936, the Board made its award in favor of the mother, finding that she was the "exclusive beneficiary" of Sherman Leslie Boysen, decd.; appellant was directed to pay Hotel Dieu a hospital bill of $39.75. From the award, appellant duly prosecuted its appeal to the district court of Liberty County. Mrs. Boysen, the moth-er, one of the appellees, answered in part as follows: " * * * and the said father of Sherman Leslie Boysen has not made any claim of any kind or character to said compensation insurance, and no award has been made by the Industrial Accident Board in his favor, and by reason of the premises the defendant and cross plaintiff, Mrs. Agnes Boysen, was and is entitled, under the Workmen's Compensation Act of the State of Texas, to the full amount of compensation payable for the death of Sherman Leslie Boysen as hereinafter more specifically alleged. * * * It is respectfully shown that Mrs. Agnes Boysen is a widow, divorced from her husband, who has remarried and for many years has contributed nothing to the support of her or her daughter * * *."

She plead also in detail, by way of cross action, the nature of her claim for compensation, and facts entitling her to compensation and to a lump sum settlement, as a beneficiary under the Workmen's Compensation Act for the death of her deceased son. A. M. Boysen, the father, plead, "Now comes A. M. Boysen, * * * and respectfully represents to the court:

"1. That he is the father of Sherman Leslie Boysen, now deceased, * * * and has not made any claim of any kind or character to said workmen's compensation, either before the Industrial Accident Board or elsewhere," and further, that he had given and assigned the full amount of compensation due him to Mrs. Boysen, and had waived all claim thereto in her behalf, and in the alternative and only in the alternative, that, if it should appear that Mrs. Boysen was not entitled to recover the full compensation, he was entitled to recover one half thereof. As a basis for such claim, he adopted the allegations contained in Mrs. Boysen's cross action and made them a part of his pleadings. He prayed that she recover the full amount, and in the alternative, if she be denied the full amount, that he recover his one half thereof. Appellant answered by supplemental petition, controverting the fact issues made by appellees. On the issues submitted by the court in its charge, the jury found in favor of appellees. On the verdict, judgment was entered in favor of Mrs. Boysen against appellant for $5,887.07 to be paid in a lump sum, and in favor of Hotel Dieu for the sum of $39.75. It was further ordered that Mrs. Boysen "do have and recover from the cross defendant, A. M.

1020

Boysen, the entire amount of the Workman's Compensation payments to which he became entitled as a result of the death of Sherman Leslie Boysen."

The jury found that Boysen was killed in the course of his employment; appellant contends that he departed from his employment by attempting to drive from Liberty to Beaumont. The general principle of law, in point on the facts of this case, was thus stated in Texas Employers' Insurance Association v. Schwarz, Tex.Civ.App., 107 S.W.2d 666, 669: "To entitle the employee to recover under the compensation act it is not essential that the cause of the injury should arise out of some act of the employment itself, in the sense in which the term is used; that is, the cause of the injury is not restricted or confined to the exact duties prescribed for the employee, but whatever may be incidental to or connected with what the employee must do within the period of the employment must necessarily belong to the employment."

The following summary of the evidence, taken from appellees' brief, supports the jury's verdict, when construed by the proposition of law we have taken from the Schwarz Case:

"Marion Martin, president of the T. S. C. Motor Freight Lines, testified that it was a common carrier by truck. The company did not make a bona fide effort not to load the trucks with more than 7000 pounds. Prior to, and about the time of Boysen's death, they were having trouble with the law with reference to overloaded trucks. When an overloaded truck was caught on the highway they had to go out and take the surplus load off of the truck and when the highway patrol would stop and weight them, if they had more than 7000 pounds on the truck they sent one of the drivers to the telephone and they called the office and told them they were being detained wherever they were. They would technically arrest the drivers, but would release them as soon as the surplus loads were relieved off the trucks. In 75% of the cases, Martin went out, and in the others, it depended on who was available. Mr. Blewett had gone out, and Frank Scott, for several years a special agent for the company, went a little, and in some cases Boysen went out. Boysen went out in something less than 33-⅓% of the cases. He was interested in getting the trucks

through as soon as possible, and seeing that the boys didn't lose any time. Getting the trucks through as soon as possible was the main purpose of going out. Boysen was dock foreman for T. S. C. Motor Freight Lines, and had worked as such for about two years. He was in direct charge of the local physical handling of the freight. He had supervision of the loading and unloading of the freight, of trucks, at the docks, and was directly in charge of the local pick-up drivers. His responsibility was to get the freight out, and if they didn't have enough trucks to handle the business that day he used his own discretion or called Martin if he was available, and if not, used his own discretion as to how he loaded the trucks. In the physical handling of Freight Boysen was in charge. About 11:00 o'clock of the evening that Boysen was killed, Martin saw him down at the warehouse loading trucks and Martin went home and went to bed. Sometime after midnight, while Martin was asleep, Boysen called him, and said some trucks were detained at Dayton for being overloaded, and asked if he could take the light "hot-shot" truck and two men, and get two drivers from Houston with trucks and call one out of Beaumont and go to Dayton and relieve them of their load so that the highway patrol would allow them to go on. 'And I told them to go ahead and unload the trucks and get them through as soon as he could.' Martin didn't know who ordered the truck out of Beaumont, but understood that Boysen did, as he went back to bed. However, Joe Malone testified that Boysen did not say anything about going to Dayton, that the plaintiffs had been led to believe it was Dayton, but it was Liberty, and that when Malone got to Liberty the T. S. C. trucks had gone on to Beaumont.

"Joe Malone, who went to Liberty in one of the trucks, and arrived there shortly after Boysen, testified that when he arrived at Liberty he walked into the cafe and asked Bud, first, where the trucks were and 'He said he had sent them to Amelia, to Beaumont rather,' and further:

"A. We set there awhile and Mr. Boysen and Mr. Walker stepped outside a moment and came back in, and Bud said, 'Well, I am going on to Beaumont.' He said, 'Perhaps the officers have moved to Amelia and if they have I want to beat the trucks there and if the law is out to

turn them back, stop the trucks,' and he said for Harrold and I to wait until we heard further at Liberty.

"Q. He wanted to go ahead of the trucks? A. Yes, sir.

"Q. And stop them if the law was there? A. Yes, sir. He told me he was going to Beaumont and if he saw any of the laws he was going to try to stop the Lines' trucks.

"Q. What else did he say? A. He told Harrold and I to stay in Liberty until we heard from him. To use his exact words, he said, 'Stay here until you hear from me.'

"Q. Then what did he do? A. He, Walker and Mayo got in No. 49 and left.

"Q. Which way? A. Toward Beaumont.

"This witness further testified that ordinarily after stopping the trucks for being overloaded they either left them go through, or turned them around and they unloaded them at the warehouse.

"Hilton Barber, a former employee of T. S. C., testified that there were occasions where the trucks were stopped and the officers left and the trucks were routed around another way without reloading, and that Mr. Blewett and Mr. Martin were seldom around the T. S. C. Motor Freight Lines at night.

"George H. Blewett, Secretary-Treasurer of T. S. C. Motor Freight Lines, testified that when a truck was stopped, or a group of trucks were stopped by officers on account of overloading and given tickets, and the officer of the company was notified, the company had no customary method of handling the situation from that point on.

"J. F. Selby, Office Manager of T. S. C. Motor Freight Lines, testified that most of Marion Martin's time was spent away from the office contacting customers, since he is the head of the traffic department and has charge of solicitations.

"Mrs. Boysen testified that whenever the highwaymen caught the trucks overloaded and turned them back if Bud didn't take trucks out there and straighten them out they would turn them back to the docks and they would have to do the thing all over again, and he was called out to do this work once or twice every week.

"E. M. Mayo, who was riding with Boysen at the time of his fatal injury, testified that the Traders & General Insurance Company paid him compensation for the injuries which he sustained at the time the car turned over when Boysen was killed, and after paying weekly compensation for awhile had paid him in a lump sum the full amount of his specific injury, which was offered as an admission of liability in the Boysen claim.

"Miss La Nell Woodyard, the waitress in the cafe, testified that Boysen talked to her about some tickets he had for the trucks which the cops had given the boys and the boys had given to him. They were scale tickets given for being overloaded. He gave them to her and started to leave them there, but then he took them with him because he was afraid the cops might stop the boys again and he wouldn't have the tickets and they would get some more. He put in two phone calls and left, saying he was going to follow the trucks to Beaumont to see if the cops followed them and stopped them again."

There was no testimony to the effect that Boysen was instructed not to go to Beaumont, nor that he was in violation of the duties of his employment in attempting to drive to Beaumont. The evidence goes no further than to raise the issue that, on this particular occasion, he was instructed to go from Houston to Liberty. But if in fact he violated his instructions, whether or not this would have taken him out of his employment was a question for the jury. On the very point, we quote as follows from Liberty Mutual Ins. Co. v. Boggs, Tex.Civ.App., 66 S.W.2d 787, 794: "If, as we have held, there was sufficient evidence to raise an issue of fact as to whether Boggs was an employee, then there was ample evidence to show that at the time he was killed he was in the course of his employment. The undisputed evidence shows he was killed while in the act of giving a student flyer lessons in flying. If it were a part of Boggs' business as employee to give flying lessons, then the fact that he disobeyed instructions to return the plane at the time he was directed to do so did not remove him from the course of his employment. He violated no part of the instruction, except that part which required that the return of the plane be 'today.' In no proper sense can it be said that he was killed as the result of disregarding his instructions; but, even if that were the case, the violation of instructions does not necessarily remove an employee from the course of his employ-

ment. The authorities establish as correct, we think, the proposition that it is only when an employee in violating instructions thereby does an act which is itself outside the course of employment that the violation of instructions becomes material. 23 A.L.R., page 1161 note; 8 R.C.L.Supplement, p. 6231, § 92a. It is probably true that only in cases where the course of employment is determinable only from, and is dependent upon, instructions, that the violation of instructions can have controlling effect. If giving flying lessons to students was in the course of Boggs' employment, then it was none the less so simply because he violated an instruction to return with the plane to the airport on the day previous." See, also, Maryland Casualty Co. v. Brown, Tex.Sup., 115 S.W.2d 394.

■ The following proposition of law was announced by the Amarillo Court of Civil Appeals in Texas Employers' Insurance Association v. White, 68 S.W.2d 511, 512: "* * * The authorities are uniform to the effect that in order to recover under the Workmen's Compensation Law in this state, the burden is on the claimant to show he was in the course of his employment at the time he was injured and upon his beneficiaries to show that the deceased was in the course of his employment at the time he received the injury resulting in his death, and the burdent was on appellees in this suit to show that Charles L. White was not in a state of intoxication at the time he received his fatal injuries."

Appellant contends that Boysen was "in a state of intoxication" when he was killed, and that the jury's verdict to the contrary was without support in the evidence and against the overwhelming weight and preponderance of the evidence. Appellant offered nine witnesses on this point, and the general effect of their testimony was that Boysen was drunk at the time he met his death. But the credibility of these witnesses was for the jury; against almost everyone of them was some circumstance of an impeaching nature. In Houston E. & W. T. Ry. Co. v. Runnels, 92 Tex. 305, 47 S.W. 971, our Supreme Court said [page 972]: "It is the province of the jury to pass upon the credibility of the witnesses, and they may disregard the testimony of a witness who has neither been impeached nor contradicted, if they believe his statements to be untrue from his manner of testifying, prejudice exhibited towards the opposite party, or his interest in the result of the litigation, or other things indicating that the evidence is not reliable. * * *"

The following summary of the testimony, taken from appellees' brief, supports the jury's verdict as against this assignment:

"Marion Martin, president of the company that employed the deceased, saw Boysen about 11:00 o'clock on the night that the accident occurred while Boysen was still working, and was within 15 feet of him. Boysen was then at work at the warehouse loading trucks, and the president, Marion Martin, went home and went to bed and didn't know whether or not Boysen had had anything to drink then. Later Martin talked to Boysen on the telephone sometime after midnight, and in the conversation with Boysen that night over the telephone, just before he was killed, Marion Martin did not form any opinion or impression one way or the other about whether or not he was intoxicated.

"Miss La Nell Woodyard, who lived in Liberty and had worked at the Tourist Cafe just across the highway from the S. P. depot for about five years, testified that she had known the deceased, Bud Boysen, for about two or three years, having seen him frequently on the occasions when they were weighing those trucks out there and he would come out to see if the cops were on the road,' and she had seen him in the cafe about 2:30 or 3:00 o'clock on the night he was killed, when she served him a bottle of beer, and talked to him about some tickets he had for the trucks which the cops had given to the boys, and the boys had given to him, the tickets being scale tickets which were given to the drivers for being overloaded. He started to leave the tickets with her and then took them with him because he was afraid the cops might stop the drivers again and he wouldn't have the tickets and they would get some more. Boysen remained in the cafe about 30 minutes and put in two phone calls, and when he left he said he was going to follow the trucks to Beaumont to see if the cops followed them and stopped them again. Before he left he instructed Pat Harrold and Joe Malone to remain there until he got back. Miss Woodyard further testified that in working at the cafe she had had experience

in waiting on and seeing men in a state of intoxication, and if a man was in a state of intoxication she would be able to detect it. On that night Bud Boysen was not in a state of intoxication. He acted just like he always did. He did not take any other drinks and did not go out of the cafe except when he left. She saw Walker, the man with Boysen, walk out and take a drink, but Boysen did not.

"Miss Dorthy Cummings was a nurse in training at the Hotel Dieu in Beaumont, and saw Boysen when he was first brought in in an ambulance directly from the scene of the accident. She was on duty in the emergency room where he was taken, and attended him there for about two hours, administering first aid and emergency treatment to him, and had an opportunity to observe him, and to her knowledge he was not in a state of intoxication. There was no odor of liquor about him, and he vomited and if there had been anything there would have been some odor to detect. He vomited in the emergency room while she was standing beside the table he was on and it got on her. The vomit from a person who has been drinking, or is intoxicated, has a unique odor, and there was nothing about Boysen's vomit that indicated he had been drinking. He died that afternoon.

"Mrs. C. A. Tetley, a graduate nurse, was called in to nurse Bud Boysen and arrived there about 6:00 o'clock in the morning and nursed him until he died the afternoon of the same day. She was in the room with him from the time she got there until he died, and he was vomiting from time to time during the day. A fractured skull, or brain injury, is customarily attended with vomiting, that being one of the regular symptoms of such an injury She had occasion to observe the odor of the vomit and to smell Boysen's breath, and to be near him a great deal during the time she was attending him, and in her opinion he was not in a state of intoxication. She did not detect any liquor about him at all and no evidence that he had been intoxicated, or had been drinking. When a man drinks and takes into his stomach alcoholic beverages and thereafter vomits, the odor of liquor can be detected in the vomit as long as the vomiting continues.

"Miss Margarette Saracca, who had been acquainted with Bud Boysen for about two and a half years, got news of his injury and went immediately to the Hotel Dieu, finding him in Room 210. She stayed there until he died, and attended him, wiping his face off from time to time and wiping his mouth when he would spit blood. She had had occasion to see men who had been injured, and rendered unconscious while in a state of intoxication before that time, having been employed at St. Joseph's Infirmary, having had occasion to attend a good many emergency cases at St. Joseph's during her six years of employment there, and she was able to form an opinion as to whether or not they were intoxicated even though unconscious, and Bud Boysen was not in a state of intoxication.

"Miss Mertis Boysen, sister of Bud Boysen, went to the hospital about 10:30 the morning after he was injured, found him in an unconscious state, and was close to him on the side of his bed, and was in and out of the room all the time until he died, and did not detect any odor of alcohol, nor notice anything about him that would indicate that he was intoxicated.

"Mrs. Agnes Boysen, mother of Bud Boysen, got the news of Bud's injury about 8:00 o'clock Saturday morning, and went to Beaumont to the hospital, where she first saw Bud unconscious, hemorrhaging from the nose and mouth, and breathing heavily. She got close to him and stayed there until he died, and did not detect any odor of alcohol on his breath, nor any evidence that he had been drinking at all."

The court gave to the jury the following definition of "state of intoxication": "By 'intoxication' as used in this issue in its legal signification is meant an abnormal mental or physical condition caused by taking into the stomach intoxicating liquors in such quantity as that thereby the physical or mental function of the body are deranged or impaired to such an extent that the person so affected is thereby totally or partially deprived of their physical or mental faculties or the normal use of their body or mind."

To the charge appellant reserved the following exceptions, quoting from its brief:

"Plaintiff, as aforesaid, excepts to the court's charge because it does not have a correct definition of the phrase 'state of intoxication,' said definition as given by the court being not only absolutely incorrect, but is clearly misleading and prejudicial

to the rights of the plaintiff in this cause, in that it does not say to the jury that by the phrase 'state of intoxication' is meant: * * *

" 'A person so under the influence of liquor as not to be entirely himself, so as to be excited and not to possess that cleaness of intellect and control of himself that he otherwise would have is intoxicated.'

"And the court is requested to give the suggested definition in lieu of the incorrect definition found in the charge."

In Federal Underwriters Exchange v. Crow, 118 S.W.2d 1073, the El Paso Court of Civil Appeals held that it was not necessary to define the word "intoxication;" so, to constitute error, the definition given by the court must have been substantively erroneous, and appellant was required to point out the very defects assigned. As we construe appellant's exception, it was too general to direct the trial court's attention to any particular misstatement of the law. Provident Life & Accident Ins. Co. of Chattanooga v. Flowers, Tex.Civ.App., 91 S.W.2d 847; Greaber v. Coca-Cola Bottling Works, Tex.Civ.App., 98 S.W.2d 1028. As against the exception, on the evidence, appellant was not injured by the definition. Under appellees' testimony, Boysen was sober; under any construction the jury could have put on appellant's testimony, he was in a "state of intoxication" as that term was defined by the court. The evidence called for no "middle ground" definition. In any event, it is our judgment that the definition was in substantial compliance with the conclusions of our Supreme Court on this point as stated in Paris & G. N. Ry. Co. v. Robinson, 104 Tex. 482, 140 S.W. 434.

After the witness, Joe Malone, had testified to facts supporting appellant's contention that Boysen was drunk, appellant asserts, and assigns error against the ruling, that the court refused to permit him to answer the following question: "Q. I will ask you whether or not you would have ridden with him in that truck in the then condition he was at the time he got in the truck?" This point was before the court more than once. The record supports the construction that the court permitted the witness to answer the question; we quote,

"Q. Mr. Malone, in the condition that you observed Mr. Boysen in that night at Liberty, if he had asked you to ride with him to Beaumont, would you have gone?

"Mr. Jacobs: We object to that question.

"The Court: I didn't understand the question. Read it. (The last question was read.)

"The Court: I sustain the objection.

"Mr. Barnes: I would like to get the answer in the record.

"The Court: I give you a full bill on it.

"Mr. Barnes: I would like to put the answer in out of hearing of the jury.

"Mr. Jacobs: I am going to withdraw the objection, if the Court please. (The last question was read.)

"A. No, I wouldn't have gone with him."

One of appellant's witnesses testified that he saw Boysen at the warehouse in Houston before Boysen left Houston to drive to Liberty, and that Boysen was, at that time, "intoxicated." After giving that testimony, the court refused to permit this witness to testify that he had seen Boysen "with quantities of liquors in his possession," prior to the time he saw him drunk at the warehouse. This ruling was not error; supporting this conclusion we quote with approval from appellees' brief:

"From the testimony that 'he often bought it by the quart and by the gallon,' might arise, first, the inference that he bought it for his personal consumption, second, that he consumed it in such quantities as to attain a state of intoxication, third, that if he attained a state of intoxication on other occasions he might have done so on the occasion of his injury, thus raising a presumption upon a presumption upon a presumption, which is not proper. International Traveler's Ass'n v. Bettis, 120 Tex. 67, 35 S.W.2d 1040; Ft. Worth Belt Ry. Co. v. Jones, 106 Tex. 345, 166 S.W. 1130.

"Generally, similar facts and transactions are inadmissible, even if of an identical nature to prove a specific fact. Davidson v. Swanson, Tex.Civ.App., 24 S.W. 2d 776."

Appellant cites in support of its proposition Lewis v. Houston Electric Co., 39 Tex.Civ.App. 625, 88 S.W. 489, 112 S.W. 593. That case is not in point. The evidence there complained of was admissible on the ground of impeachment.

■ Boysen drove his. car from Liberty to the place where he was killed. E. M. Mayo and a boy named Walker were with him from the time he left Liberty to the place of the accident. It was clearly established that Boysen drove the car in a negligent and careless manner; Mayo testified: "Well, on the first curve out of Devers—the second curve out of Devers; the first S curve; he taken the right hand side of the road. The wheels ran off on the right hand side first and caught the shoulder and he cut back to the left and back to the right and back to the left and that is when he turned over." Walker did not testify. On the evidence, we overrule appellant's assignment that the court erred in refusing to submit to the jury these issues: (a) "That the injury in question was caused by said employee's wilful intention to injure himself;" (b) "That the injury in question was caused by said employee's wilful intent to unlawfully injure some other person." Neither of these issues was raised by the evidence.

■ The court did not err in refusing to submit the following issues to the jury:

"1. At what rate of speed do you find from a preponderance of the evidence that Sherman Leslie Boysen was driving at the time and place where the truck which he was driving left the highway immediately before the fatal crash?

"2. Do you find from a preponderance of the evidence that Sherman Leslie Boysen's driving at that rate of speed resulted directly in his injuries? "

Appellant cites in support of its assignment Bugh v. Employers' Reinsurance Corp., 5 Cir., 63 F.2d 36. The case is not in point. The point before us is not that Boysen was doing an act in violation of his employment—the act of driving the truck; the jury found that he was acting in the scope of his employment in driving the truck, and we have affirmed that finding. The point before us is that Boysen drove the truck at a speed in violation of law, which is one of contributory negligence only, and not available to appellant under the Workmen's Compensation Act. Vernon's Ann.Civ.St. art. 8306 et seq.

■ The court did not err in refusing to submit the following issue: "Do you find from a preponderance of the evidence that Sherman Leslie Boysen proceeded east of Liberty at the time and place in question for the purpose of shielding or protecting the overloaded trucks from further delay because of the possible contact with the highway patrol by the overloaded trucks which he sent on from Liberty?" This issue was multifarious in the following respects, and, therefore, appellant cannot complain of the court's refusal to submit it: (a) Boysen's purpose in going east from Liberty; (b) whether or not the trucks were overloaded; (c) the possible contact with the highway patrol. It was also a comment on the weight of the evidence in indicating that the trucks were overloaded.

■ Appellant assigns error against the following argument by appellees' counsel:

"My friends, this is not the first time you have heard - of the Workmen's Compensation Act. It is a good law. It was passed by the Legislature of the State of Texas as a humanitarian act. It has offered relief to many workers and their dependents who were left without money. You know from the charge in this case and from the pleadings of the plaintiff or the claimant, Mrs. Boysen, who came in and alleged that Bud was killed, that he was killed in the scope of his employment, in the furtherance of the business of the employer, that the injury and death arose out of and had to do with the employment, that it was incident to the employment, as I say, you know that one of the elements of a compensation claim is that the injury or death were received in the course of his employment, must be connected with it, must be in the furtherance of their business, and as the court tell you, it may be received on the premises of the employer or elsewhere.

"Mr. Barnes: We object to counsel's argument about what the elements of a claim are under the law and request the court to instruct the jury not to consider any of that argument.

"The Court: I sustain the objection and instruct you gentlemen not to consider the argument for any purpose. .

"Mr. Jacobs: I withdraw the argument with reference to what the law is, but the pleadings show and the charge before you shows that in this case the question arises as to whether it was in the course of his employment, whether it was in the furtherance of T. S. C. Motor Freight Lines' business, and all those other things. Now, gentlemen, if it is in this case, likewise it

was in the claim of Ewell Meade Mayo against the company, and they paid him and their payment of Ewell Meade Mayo is an admission that Ewell Meade Mayo was acting within the scope and course of his employment.

"Mr. Barnes: We object to the argument as to the claim of Ewell Meade Mayo being the same as this, because the evidence is absolutely contrary on that point as a matter of law.

"The Court: All right. I give you a bill.

"Mr. Barnes: Note our exception.

"Mr. Jacobs: You can take the fact that they paid him $600.00 in one lump sum as an admission that Ewell Meade Mayo was acting in the scope of his employment for T. S. C. Motor Freight Lines, that Ewell Meade Mayo was acting in the furtherance of the business of T. S. C. Motor Freight Lines, that his injury arose out of that employment, that his injury was connected with that employment, that it was incidental to it, that Ewell Meade Mayo was entitled to compensation. You can take that as confessed.

"Now then, if Ewell Meade Mayo was working under the direction of Bud Boysen—remember, Marion Martin didn't tell him who to take; Marion Martin left the names of the men and the number of trucks and where they were coming from to Bud Boysen, because Bud knew that he was running it that way, and Bud had the discretion to do it that way and Bud told Mayo to get up and go to Liberty. If Bud Boysen was acting out of the scope of his authority in going past Liberty himself, by the same token he was acting outside the scope of his employment in taking Ewell Meade Mayo and the Insurance Company has made a big mistake in paying Ewell Meade Mayo, but I am glad he got the money. Boysen was the only one who could send him. If he could send Mayo, he could send himself. It is a tangled bunch of testimony, but you are the exclusive judges of the credibility of the witnesses. You know that Bud Boysen wasn't following orders, because Marion Martin said, 'I have testified to all the orders there are and there weren't any more'."

E. M. Mayo, a witness for the Insurance Company, testified that up until March 7, 1936, the date of the accident in which Boysen was injured, he worked for T. S.

C. Motor Freight Lines, helping load and unload trucks. His foreman on March 6th and 7th, was Boysen. About 12:30 or 1 o'clock Boysen came to his home and asked him to get up and help unload some trucks at Liberty, and he got up and dressed and went with him. He was riding in the truck when it turned over. Mayo received an injury on that morning. He was paid Workmen's Compensation by the Traders' & General Insurance Company for injuries which he sustained at the time the car turned over and Boysen sustained the injuries that later resulted in his death. In June he was paid for 125 weeks, in a lump sum. This evidence was not disputed. The payment of Mayo's claim by appellant was admissible on the issue of its liability in this case; and the argument was justified on that point. Magnolia Petroleum Co. v. Reed, Tex.Civ. App., 42 S.W.2d 274; Southern Underwriters v. Girard, Tex.Civ.App., 107 S.W. 2d 775. The injurious effect, if any, of that part of the argument to which appellant first excepted was removed by the court's instructions to the jury. Schmidt v. Houston Electric Co., Tex.Com.App., 242 S.W. 1019; St. Louis, S. F. & T. Railway v. Green, Tex.Com.App., 37 S.W.2d 123; Galveston, H. & S. A. Ry. Co. v. Marti, Tex.Civ.App., 183 S.W. 846; Lucey v. Dedman, Tex.Civ.App., 21 S.W.2d 546, and Dallas Ry. & Terminal Co. v. Price, Tex.Civ.App., 94 S.W.2d 884, 885. The balance of the argument, excluding the reference to Mayo's testimony, merely referred to the pleadings and the court's charge, stating no extrinsic facts, and did not advise the jury the effect of its answers. We do not think the argument was erroneous. Galveston, H. & S. A. R. Co. v. Harling, Tex.Com.App., 260 S.W. 1016; Levy v. Rogers, Tex.Civ.App., 75 S.W.2d 304; City of Beaumont v. Kane, Tex.Civ. App., 33 S.W.2d 234; Payne v. McIntyre, Tex.Civ.App., 263 S.W. 1100; Miller v. Wyrick, Tex.Civ.App., 96 S.W.2d 253; St. Louis S. W. Ry. Co. v. Lowry, Tex.Civ. App., 119 S.W.2d 130.

■ Counsel did not commit error, requiring a reversal of the judgment of the lower court in arguing to the jury that "they (appellant's witnesses) know they have a financial interest in this case." Some of the witnesses offered by appellant were employees of the T. S. C. Motor Freight Lines; one of the witnesses was married to one of the employees; the pres-

ident of T. S. C. Motor Lines testified that his company had a direct financial interest in the result of this law suit, in that the greater his losses, the higher his compensation rate. When the argument was made, appellant's counsel did not direct the court's attention to any one of the witnesses who did not have a financial interest in the law suit. The argument was not inflammatory, and there was nothing in it to prejudice appellant's rights.

While the evidence did not support counsel's argument that one of the nurses "was vomited on all over her dress," nurse Cummings testified that, while she was nursing Boysen after he was injured, he vomited and, "Q. Did any of that get on you? A. It did."

The evidence supports the average weekly wage calculation of $17.98, as fixed by the judgment. In estimating the present cash value of the compensation and fixing the amount, the judgment was excessive to the amount of $65.

 Appellant excepted to the court's charge because the court refused to define the term "average annual wage," as used in the charge. The jury found that Boysen worked for T. S. C. Motor Freight Lines "more than substantially the whole of the year immediately preceding his injury," and was actually paid as wages during the year immediately preceding his death the sum of $1,558.44. On these facts the court was required to compute the average weekly wage of Boysen by taking ¹⁄₅₂ of the amount actually paid. Petroleum Cas. Co. v. Williams, Tex.Com.App., 15 S.W.2d 553. So, if there was error in not defining the term "average annual wage," the error was immaterial. Ward v. Cathey, Tex.Civ.App., 210 S.W. 289; Yoes v. T. & P. Ry. Co., Tex.Civ.App., 211 S. W. 311; Peters v. Williams, Tex.Civ.App., 271 S.W. 430, 431; Stepp v. T. & P. Ry. Co., Tex.Civ.App., 20 S.W.2d 324; Texas Employers' Ins. Ass'n v. Marsden, Tex. Civ.App., 57 S.W.2d 900.

 The issue of lump sum settlement was submitted by the following question: "Do you find from a preponderance of the evidence that manifest hardship and injustice will otherwise result, if a lump sum settlement is denied Mrs. Agnes Boysen?" The issue was raised by the evidence, and, as framed, the question was not duplicitous. It was submitted in the language of the statute; appellee was required to establish both "manifest hardship" and "injustice." Texas Employers' Ins. Ass'n v. Ray, Tex.Civ.App., 68 S.W. 2d 290; Traders & General Ins. Co. v. Blancett, Tex.Civ.App., 96 S.W.2d 420; Southern Underwriters v. Shipman, Tex. Civ.App., 97 S.W.2d 370; Traders & General Ins. Co. v. Rhodabarger, Tex.Civ. App., 93 S.W.2d 1180. There is no merit in the contention that the question allowed "the jury to go off into the realm of speculation as to any facts which might constitute a basis for a lump sum even though those facts were not supported by the pleadings;" nor did the question submit a mixed question of law and fact.

 The claim filed by Mrs. Boysen brought before the Industrial Board all statutory claimants, and gave the Board full jurisdiction to determine all issues of fact and law arising on the claim; specifically, it included the claim that A. M. Boysen could have asserted before the Board, as the father of the deceased. Texas Employers' Ins. Ass'n v. Williams, Tex.Civ. App., 57 S.W.2d 218; Lloyds Casualty Co. v. Meredith, Tex.Civ.App., 63 S.W.2d 1051. By her cross action, Mrs. Boysen made A. M. Boysen a party to this suit, and as his claim had been adjudicated by the Board, the district court had jurisdiction both of his person and of his statutory claim for compensation. Jago v. Indemnity Ins. Co., 120 Tex. 204, 36 S.W. 2d 980, 983. By his answer Boysen disclaimed in favor of the mother of the deceased and gave her his interest in the compensation; by the evidence he assigned, by written contract, his interest in the claim to the mother. All issues of fact on the waiver and assignment were submitted to the jury, and found in favor of the mother. We have no doubt that A. M. Boysen had the power to waive his rights in favor of the mother, and to assign his rights to her. Texas Employers' Ins. Ass'n v. Sloan, Tex.Civ.App., 36 S.W.2d 319. The provisions of Sec. 3 of Art. No. 8306, prohibiting assignments of claims for compensation do not control assignments of death claims. We quote from Sec. 3 of Art. No. 8306: " * * * no such right of action and no such compensation and no part thereof or of either shall be assignable, except as otherwise herein provided, and any attempt to assign the same shall be void."

1028

Sec. 8a of Art. No. 8306 falls within the exception to Sec. 3, and reads in part, "* * * and the amount recovered thereunder shall not be liable for the debts of the deceased nor the debts of the beneficiary or beneficiaries and shall be distributed among the beneficiaries as may be entitled to the same as hereinbefore provided according to the laws of descent and distribution of this State; provided the right in such beneficiary or beneficiaries to recover compensation for death be determined by the facts that exist at the date of the death of the deceased and that said right be a complete, absolute and vested one."

Thus it appears that the claim for death is "complete, absolute and vested" and, therefore, subject to assignment where such assignment is not prohibited by law; and Sec. 8a has no provision prohibiting assignment. But. Secs. 3 and 8a should be construed as exemption statutes; Pickens v. Pickens, 125 Tex. 410, 83 S.W.2d 951. Construed as exemption statutes, the right granted is personal and can be waived. 18 Tex.Jur. 846. The point raised by this assignment is not available to the insurer. Richey v. Ziegler, 89 Cal.App. 35, 264 P. 293; In Richey v. Ziegler the court said [page 294]: "It is apparent that defendants are invoking the aid of an act to resist the payment of an award which was designed to protect disabled workmen and their dependents, in the event of death, from making assignments of industrial compensation. That the Legislature never intended the act should be used as a shield for this purpose goes without saying."

The judgment constitutes a bar to any further prosecution by A. M. Boysen of his claim against appellants. He plead waiver, gift and assignment to Mrs. Boysen; proved these issues as plead; and on his pleadings, prayer, and proof she was adjudged to hold and own his claim.

We overrule the assignment that the award in favor of Hotel Dieu was without support in the evidence.

It is ordered that the judgment of the lower court in favor of appellee Mrs. Agnes Boysen be reformed by deducting therefrom the sum of $65, and as reformed, that it be in all things affirmed. In all other respects, the judgment of the lower court is affirmed.