## FEDERAL UNDERWRITERS EXCHANGE
### v. WALKER et al.
#### No. 8917.

Court of Civil Appeals of Texas. Austin.
Nov. 6, 1939.

Rehearing Denied Nov. 29, 1939.

White, Taylor & Gardner, of Austin, and Benbow, Saunders & Holliday, Claude Williams and Touchstone, Wight, Gormley, Strasburger & Price, all of Dallas, for plaintiff in error.

Bryan & Maxwell, of Waco, Jim W. Weatherby, of Kerrville, and Felts, Wheeler & Wheeler, of Austin, for defendants in error Jess and Jewel Walker.

Chas. O. Betts, of Austin, Cecil D. Redford, of San Antonio, and Yelderman & Yelderman and Gibson R. Randle, both of Austin, for defendant in error Lloyds America.

Greenwood, Moody & Robertson and Herman Jones, all of Austin, for defendant in error C. B. Cook.

## McCLENDON, Chief Justice.

This is a workmen's compensation case. The Vincennes (Vincennes Steel Corporation) was the employer; Dudley Walker (W. D. Walker) was the employee, and was killed in the course of his employment; the Federal (Federal Underwriters Exchange) was the insurance carrier; and Jess Walker and wife, Jewel Walker, were father and stepmother, respectively, of Dudley Walker. The Federal contended that the Jones Company (Clarence Jones Construction Company), which carried compensation insurance with the Lloyds (Lloyds American) was a sub-contractor under the Vincennes, and that Dudley Walker was an employee of the Jones Company and not of the Vincennes. The judgment (upon a special issue verdict) awarded the lump sum of $3,230.74 each to Jess and Jewel Walker against the Federal. The latter has appealed.

The contentions of the Federal relate to the following subjects: (1) exclusion of testimony of Jennings (W. M. or Wm. Jennings) offered in support of the Federal's assertion that Dudley Walker was an employee of the Jones Company and not of the Vincennes; (2) allowing Jewel Walker to intervene in the suit; (3) submitting the question of lump sum settlement in a single issue as to both Mr. and Mrs. Walker instead of in separate issues as to each; and (4) failure to place the burden of proof upon the Walkers to establish by a preponderance of the evidence the amount of weekly wage of Dudley Walker.

Upon the exclusion of Jennings's testimony, we make the following statement: The Vincennes had contracted with the State Highway Department to construct the Montopolis bridge, over the Colorado River on highway 71, including the excavation. February 15, 1937, the Federal filed with the Industrial Accident Board the requisite notice showing that the Vincennes had become a subscriber to the employers liability act and that it had a compensation policy with the Federal as insurance carrier effective January 20, 1937, and expiring January 20, 1938, giving the number of the policy. This notice was signed by the Vincennes, "By F. R. Sargent, Vice Pres." It was also signed and filed by the Federal. The policy itself was introduced in evidence. The premium was predicated upon the amount of the pay rolls of the Vincennes, and the policy provided for monthly pay roll adjustments. As this was a project to which the Federal Government contributed, weekly pay rolls were required to be filed with the Highway Department. These pay rolls were filed by the Vincennes and showed that all the work done under the contract was for the Vincennes. Jennings was carried on the pay rolls as superintendent, and the pay rolls were signed by him, he describing himself as superintendent and stating that he was an employee of the Vincennes. Dudley Walker was carried on the pay rolls as excavation foreman up to April 7, 1937, the date he received his fatal injuries. The employees were paid by check drawn on the American National Bank of Austin, Texas, signed "Vincennes Steel Corporation by W. M. Jennings, Superintendent." These included the pay checks of Dudley Walker and Jennings. Premiums on the compensation policy were adjusted and paid by the Vincennes to the Federal on the basis of these pay rolls. The wages paid Dudley

Walker, as shown by the pay rolls, were taken into account in estimating the amount of premiums actually paid on the policy. The rules of the Highway Department required that all subcontracts be submitted to and approved by the Department, and no subcontract was allowed covering more than twenty per cent. of the entire contract. No subcontract was filed with the Department, the entire dealings in so far as concerned the Department being with the Vincennes alone. There was filed with the Department, however, what is termed a lease contract under which the Jones Company agreed to lease to the Vincennes certain equipment to be used in connection with certain specified portions of the work, the consideration clause reading: "In consideration for the furnishing and use of the aforesaid equipment, said Party of the First Part (the Vincennes) agrees to pay to said Party of the Second Part (the Jones Company), to cover all rental, the remainder of the profit left from 95% of the value of the above twelve items as paid for by the State, after deducting the cost of labor, materials and all other expenses properly charged to the completion of these items."

May 18, 1936, "Clarence Jones Construction Company by Clarence Jones, Applicant," applied to the Lloyds for compensation insurance for the period 5–18–1936 to 5–18–1937, to cover, among other specified operations, concrete bridge construction, anywhere in the State of Texas. The application showed the applicant to be an "Individual," in response to the inquiry: "Individual, co-partnership, corporation, estate?" Policy issued under this application on a form known as "Standard Workmen's Compensation and Employers Liability Policy," with provision for premiums based upon amount of pay rolls similar to those in the Federal's policy. The Jones Company never submitted to the Lloyds any pay rolls covering the Montopolis bridge construction, and never paid any premiums to the Lloyds predicated upon work on that project.

The above facts were established by uncontradicted evidence.

The award of the Industrial Accident Board was on October 22, 1937, and this suit was filed by the Federal, to set aside the award, November 22, 1937. In its second amended original answer, filed October 24, 1938, the Federal for the first time asserted that Dudley Walker was an employee of the Jones Company and not of the Vincennes; and while admitting that it had received and accepted premiums from the Vincennes based upon pay rolls covering the items specified in the lease agreement amounting to $3,541.58 (which sum, the pleading asserted the Federal "here now tenders into this court * * * to be delivered to whomsoever party the court may hold is entitled thereto"), it asserted, nevertheless, that it was not estopped to deny liability under the policy because it collected the premiums in accordance with the express terms of the policy without knowledge of the fact that Dudley Walker was an employee of the Jones Company and not of the Vincennes.

The excluded testimony of Jennings, which was taken by deposition in Louisiana, on October 20, 1938, may be substantially stated as follows:

The Jones Company was a copartnership, the partners being Clarence Jones and Jennings. Jones attended to the financial arrangements and Jennings's "part was to handle the making of estimates, figure the bids and do the actual superintending of the construction work, in the way of building of bridges, roads, culverts, pavements, and such like." The net profits and losses of the partnership were to be shared ⅔ by Jones and ⅓ by Jennings. He enumerated several prior construction contracts of the Jones Company, including a highway contract in Burnet County. The Jones Company put in a bid for the concrete and foundation work (items listed in the lease agreement) on the Montopolis bridge contract. This bid was embodied in the Vincennes bid, the Jones Company being a "silent bidder." The lease contract was a "subterfuge," executed to evade the Highway regulation that no subcontract would be allowed covering more than 20% of the entire contract. There was a subcontract in writing between the Jones Company and the Vincennes, but he did not know what became of it. Its terms were:

"All equipment and tools was to be furnished by Clarence Jones Construction Company for the concrete and foundation work and it was also to make the payrolls for this work, in addition it was to pay its proportionate part of the bond required of Vincennes Steel Corporation, guaranteeing the performance of its contract on the Montopolis Bridge job. When Clarence Jones Construction Company failed to carry out its obligation to meet the payroll

on the concrete and foundation work on the Montopolis Bridge job, another contract was entered into between Vincennes Steel Corporation and Clarence Jones, Construction Company, in which contract Clarence Jones Construction Company agreed to pay the Vincennes Steel Corporation 5% of the Clarence Jones Construction Company gross bid for the concrete and foundation work in consideration for Vincennes Steel Corporation furnishing the payroll to the Clarence Jones Construction Company for the concrete and foundation work on said job; this last mentioned contract was also signed by Mr. F. R. Sargent for the Vincennes Steel Corporation and by Mr. Clarence Jones for Clarence Jones Construction Company."

Jennings was the superintendent for the Jones Company on this job, employed and discharged the labor; and Dudley Walker was an employee of the Jones Company and not of the Vincennes.

■ Jennings's testimony was objected to on the ground, among others, that the subcontract testified to was in writing and was the best evidence of its terms.

Sargent, vice president of the Vincennes, testified

That: he had full charge of the Montopolis bridge construction from its inception in December, 1936, until completion and acceptance in February, 1938; and spent considerable time at the site directing the work, including equipment and materials to carry it on; he had power to employ and discharge all workmen and foremen on the job during the entire period of construction; he employed Jennings as superintendent for the Vincennes and gave him authority to hire and fire employees; Dudley Walker was in the employ of the Vincennes and not the Jones Company during the time he worked on the Montopolis bridge and at the time he received his fatal injuries; Sargent discharged Jennings as foreman for the Vincennes July 1, 1937; Jennings's wages as Vincennes superintendent during the period of his employment (2–1–27 to 7–1–37) were paid by the Vincennes; there was no contract between the Vincennes and the Jones Company, except the lease contract.

Stubbs, Highway Department engineer in charge (superintendent) of bridge construction in the vicinity of Austin, testified with reference to the Montopolis bridge job,

that: he dealt with Sargent and Jennings who represented themselves as acting for the Vincennes; most of his dealings were with Jennings, who hired and fired employees, directed their work, and prepared and signed the weekly pay rolls for the Vincennes. Bennett, resident engineer for the Highway Department on this job, testified to the same effect.

The objection to Jennings's testimony that the written instrument was the best evidence of the terms of the asserted subcontract, was well taken. Jennings did not claim to be the custodian of the instrument, and no effort appears to have been made to ascertain if it was in Jones's possession.

■ But even had there been an agreement collateral to the lease contract of the import of Jennings's testimony, it could not affect the relations between the Federal on the one hand and Dudley Walker and his beneficiaries on the other. The Federal wrote the policy which, in express terms, covered the entire Montopolis bridge contract, and it collected premiums based upon the pay rolls covering the entire job, including the wages of Dudley Walker; which pay rolls were submitted to and examined by it. Whatever may have been the private arrangement between the Vincennes and the Jones Company, it is undisputed that this policy was taken out and the premiums paid to cover and did in fact cover all employees on this job including Dudley Walker. He was one of the insured in the policy for whose benefit it was taken out and the premiums paid by the Vincennes. It is not material whether these payments were ultimately borne by the Jones Company under a secret subcontract agreement with the Vincennes, instead of under the lease agreement. The rights of the beneficiaries are fixed by the express terms of the policy and the acts done thereunder, as they existed at the time Dudley Walker was fatally injured. Liability under the policy accrued at that time and cannot be defeated by showing a collateral secret agreement between the Vincennes and the Jones Company. The Federal is estopped to deny liability to Dudley Walker or his beneficiaries regardless of whether it knew of the asserted subcontract.

■ There is another ground supporting the trial court's ruling excluding Jennings's testimony. Under the facts of this case it was wholly immaterial whether Dudley Walker was an employee of the

Jones Company. If we assume the truth of Jennings's testimony, then the agreement between the Jones Company and the Vincennes was substantially this: The Jones Company could not bid on the items in the lease agreement as a subcontractor because of the noted Highway Department regulation. It therefore agreed that the Vincennes should make the bid on the entire contract, carry the Jones Company's employees on its pay rolls, take out compensation insurance covering all Jones Company's employees, pay the premiums thereon for the Jones Company, collect the compensation for the work from the Highway Department, and account to the Jones Company for 95% of the net profits derived from these items. Under such arrangement, as between the Jones Company and the Vincennes, the latter assumed the role of employer of all workmen on the Jones Company contract in so far as concerns the relations between the Vincennes, on the one hand, and (1) all workmen on the subcontract and (2) the Federal, on the other. By express contract between the Jones Company and the Vincennes, the former's employees on this job became the employees of the latter. There is no principle of public policy which would invalidate such agreement, at least in so far as concerns the compensation insurance. Even if it were conceded that the relation of employer and employee existed between the Jones Company and Dudley Walker, the compensation insurance was taken out with its consent, at its expense, and for the benefit of its employees. The fact that the Vincennes was only the nominal employer could not affect the validity of the policy as covering this particular risk. We direct attention in this connection to the fact that companies writing this character of insurance are not at liberty to select their risks, and may not reject an application for insurance. Southern Casualty Co. v. Freeman, Tex. Civ.App., 13 S.W.2d 148, affirmed, Tex. Com.App., 24 S.W.2d 370. This particular holding was expressly approved in Texas Emp. Ins. Ass'n v. United States Torpedo Co., Tex.Com.App., 26 S.W.2d 1057. The premium rates on this character of insurance are fixed by the State Insurance Commission, and would have been the same had the Jones Company been named as employer instead of the Vincennes, and the Federal could not have refused to write the policy in the name of the Jones Company as employer. It, therefore, makes no difference whether the policy was written in the name of the Jones Company or the Vincennes. In the absence of fraud perpetrated upon the Federal *to its injury,* of which there is no evidence or claim, it cannot repudiate its expressly assumed liability, after it has accrued. If there was any fraud perpetrated it was upon the Highway Department, but it is not complaining. To permit the Federal to repudiate its liability would give legal sanction *to a palpable fraud upon the Walkers.*

The right of Jewel Walker to intervene and recover in the suit is challenged on the ground that she was not a party to the proceeding before the Industrial Accident Board and did not appeal *from its award which gave the entire compensation to her husband, Jess Walker.* The facts pertinent to this issue are these: The application for compensation filed with the Board April 30, 1937, was signed by Jess Walker. Under "Names and P. O. Address of the Beneficiaries of the Deceased" it gave Jess Walker (father) and Pauline Walker (sister). Its concluding paragraph read: "This claim for compensation, with respect to such injury and because of the death of deceased, is made in behalf of and for each and all of the legal Beneficiaries of the deceased as well as by and for the undersigned, he herein acting for himself and such legal Beneficiaries."

Jess Walker filed an affidavit in the proceeding before the Board June 17, 1937, which showed that Dudley Walker was born December 3, 1911; that his mother died March 14, 1918; that Jess Walker married Jewel Walker October 1, 1927; that they lived together continuously thereafter and had three children. The affidavit, besides stating the facts, expressly stated that Jewel Walker was the stepmother of Dudley Walker at the time of his death. The award was made October 22, 1937. The claim of Pauline Walker was denied on the ground that she had failed to establish her dependency on Dudley Walker. Jess Walker was awarded $20 per week for 360 weeks upon the finding that: "Deceased left surviving as his exclusive legal beneficiary Jess Walker." No mention is made of Jewel Walker in the award. The claim filed by Jess Walker on behalf of all beneficiaries made Jewel Walker a party to the proceeding the same as if she had been expressly named in the application; and the award constituted an adjudication of her claim by the Board. Traders &

General Ins. Co. v. Boysen, Tex.Civ.App., 123 S.W.2d 1016, error dismissed Correct Judgment. She and her husband Jess Walker were, as a matter of law, entitled to the entire compensation under the compensation statute (Art. 8306, § 8a, R.C.S.). See American General Ins. Co. v. Richardson, Tex.Civ.App., 132 S.W.2d 161. She had the power to waive her claim in favor of her husband. Texas Emp. Ins. Ass'n v. Sloan, Tex.Civ.App., 36 S.W.2d 319, error dismissed; also Boysen and Richardson cases, above. If her failure to appear in the proceeding constituted such waiver, then Jess Walker was entitled to all the compensation. Certainly, in that event, he had the right to reinvest her with her original right, and allow one-half of the compensation to be recovered in her name. The Federal had no interest in whether the recovery was had by one of the spouses for the full amount, or by both in equal shares. The amount was in no way dependent or contingent upon whether one or both spouses shared in the recovery. Moreover the husband is authorized to sue "either alone or jointly with his wife for the recovery of the separate property of the wife." His failure or neglect to do so would authorize the wife to "sue alone by authority of the court." R.C.S. Art. 1983. Assuming that the wife's interest was her separate property, this article made it the duty of the husband to sue or make claim for the wife's interest, and recovery by him in his own name would inure to her benefit to the extent of her interest. She should therefore have been made a party to the appeal by the Federal. Having failed to do so it can assert no valid objection to her intervention or to her recovery. See Jago v. Indemnity Ins. Co., 120 Tex. 204, 36 S.W.2d 980.

Upon the issue of lump sum settlement, the record showed without dispute the following:

Jess and Jewel Walker were married in 1927, and had continuously thereafter lived together, as husband and wife. There were three children by this marriage, two of whom, aged ten and seven years respectively, were still living. There was a stepson of Jess Walker, aged fifteen years, also a member of the family. Jess Walker was a farmer, farming 40 acres of rented land. He owned a team and farming implements, consisting of a cultivator, planter, plows, sweep and buster. The soil where he lived was sandy, and he depended on cotton and corn crops for his livelihood, and made no crops in 1938. Other than the above he owned no property, except ¼ interest in an estate which consisted of 210 acres of sandy land, the improvements on which were poor, worth about $20 per acre and encumbered for $800. His interest therein was worth about $850. Jewel Walker had no property of her own. Jess Walker testified that he wished the amount of the judgment in a lump sum in order that he might purchase a farm as a home for himself and family.

Considering the situation of the parties, their occupation and financial circumstances, and the purpose for which they desired to use the money, it seems clear that the interests of the two spouses were identical in so far as the method of payment was concerned and there was but one substantial issue, namely, whether the entire compensation should be paid in a lump sum or in weekly installments.

We reach this conclusion independently of whether the compensation was the community or separate property of the Walkers. This particular question does not seem to have been passed upon. Sanchez v. Texas Em. Ins. Ass'n, Tex.Civ.App., 51 S.W.2d 818, and cases cited therein are not in point. The question there was whether the compensation of a surviving wife for the death of her husband constituted community property. In Texas Employers' Ins. Ass'n v. Boudreaux, Tex.Com.App., 231 S.W. 756, it was held that the compensation was distributable among the beneficiaries according to the inheritance laws applicable to the community and not the separate property of the deceased. This holding was based upon the analogy arising out of the source of its acquisition. In Lee v. Lee, 112 Tex. 392, 247 S.W. 828, however, Judge Taylor's opinion in the Boudreaux case was interpreted as holding that such compensation was community property. Judge Speer reaches the opposite conclusion predicated upon the fact that "the right to it has its inception after the dissolution of the marriage by the death." Speer's Marital Rights in Texas, 4th Ed., p. 953, § 721. Be that as it may, the question here is whether the share of compensation of the father and stepmother is community, or the separate property of each; not whether it was the separate or community estate of the deceased and his surviving wife, had he been married. In Arnold v. Leonard, 114 Tex. 535, 273 S.W. 799, it

was held that the constitutional provision (Art. 16, § 15, Vernon's Ann.St.Const.) defining the separate property of the wife was "exclusive, precluding the power of the legislature to enlarge or diminish the estate. The provision reads: "All property, both real and personal, of the wife, owned or claimed by her before marriage, and that acquired afterward by gift, devise or descent, shall be her separate property; and laws shall be passed more clearly defining the rights of the wife, in relation as well to her separate property as that held in common with her husband."

The question whether the benefit to the stepmother, who, under the act stands in the place of the mother (See Richardson case, above), is her separate property depends therefore upon the proper classification of the manner of its acquisition, that is whether "by gift, devise or descent." Clearly its acquisition is not by "devise or descent," since it was no part of the estate of the deceased. McDonald v. Texas Emp. Ins. Ass'n, Tex.Civ.App., 267 S.W. 1074, error refused. Nor is it properly speaking a gift. If it should be held to be separate property of the wife, it must be so by analogy. Appellant relies upon Federal Underwriters Ex. v. Bullard, Tex.Civ.App., 128 S.W.2d 126, 135, in which the court said that the husband's "testimony tended to show a sufficient basis for a lump sum settlement of his claim for compensation. * * * But there was no testimony from any source to show the same right in" the wife. In the original opinion it is stated that the husband testified without contradiction that he and his wife were separated and not then living together. That statement was withdrawn in a rehearing opinion. However, the opinion does not show the basis upon which the husband's claim for lump sum settlement was made; and we have no means of knowing whether there is substantial analogy between that case and this. The case does hold, however, that where separate award is made to the wife, it constitutes her separate property, on the theory that the husband has waived his community interest therein, if it be held to be community property.

The eighth special issue which is complained of in the Federal's brief as failing to place the burden of proof upon the Walkers, reads: "What sum of money do you find and designate as the average weekly wages of W. Dudley Walker, which to you may seem just and fair to all parties cross plaintiffs and cross defendants? Answer in dollars and cents."

The Walkers contend that since this issue was predicated upon sub-section 3 of Sec. 1 of Art. 8309, it is not requisite that the amount fixed by the board, court or jury shall be upon a preponderance of evidence, since it was the manifest purpose of that section to leave the board, court or jury free to compute the amount "in any manner which may seem just and fair to both parties." This charge is in substantially the same language as that approved in Tex. Employers' Ins. Ass'n v. Bateman, Tex. Civ.App., 252 S.W. 339. However, this specific objection does not appear to have been urged in that case. There seems to be no case expressly upon this point with reference to sub-section 3. However, Art. 8307, Sec. 5, Vernon's Ann.Civ.St. art. 8307, § 5, expressly places the burden of proof upon the party claiming compensation; and we see no valid reason why this provision should not apply to sub-section 3 as well as to any other provision of the act. The jury were charged generally to confine their deliberations to the evidence and not to consider or discuss anything outside the evidence.

The amount of the judgment ($20 per week) is amply supported by the evidence; and it is hardly probable that any different result would have been reached had the phrase, "by a preponderance of the evidence," been inserted in the charge.

We overrule this objection to the charge, however, upon the ground that it was not clearly and distinctly called to the trial court's attention, but was adroitly imbedded in an involved objection in such a manner as was calculated to conceal it, with the palpable purpose of having it overlooked by the court. The court's charge was only four pages long and was clearly and concisely drawn, submitting only nine special issues. The Federal filed 31 pages of objections to the charge; many of which were long, involved, argumentative, and redundant. To each of the nine special issues seven objections were filed, lettered from (a) to (g) inclusive. These objections were in exactly the same language. We quote (italicizing ours) the objections to issue No. 8, the one in question:

"This cross-defendant, Federal Underwriters Exchange, objects and excepts to Special Issue No. 8 of the Court's main charge for the reason that:

"(a) There is no evidence upon which to base the submission of said issue to the jury.

"(b) The evidence is wholly insufficient upon which to submit said issue to the jury.

"(c) There are no pleadings upon which to base the submission of said issue to the jury.

"(d) The pleadings are wholly insufficient upon which to submit such issue to the jury.

"(e) In said issue the Court erroneously places the burden of proof upon the cross-defendant, Federal Underwriters Exchange, herein.

"(f) In said issue the Court erroneously places the burden of proof upon the Federal Underwriters Exchange in that in the issue as couched and framed the jury is not told upon whom properly rests the burden of proof.

"And further, in that the issue as couched and framed the jury is told that an answer thereto which is favorable to this cross-defendant, Federal Underwriters Exchange, must be established by a preponderance of the evidence; and said issue as couched and framed is misleading and confusing to the mind of the ordinary laymen who constitute the jury, and said issue is calculated to and will in all probability confuse and mislead the jury in that the language used in said issue is not understandable to the minds of the ordinary laymen who constitute and compose the jury and *if said issue is literally interpreted it wholly fails to definitely and clearly place the burden of proof upon the plaintiffs, as required by the terms of the Workmen's Compensation Act.*"

"(g) Said issue is upon the weight of the evidence in that, in the language used in said issue, the Court assumes that there is a preponderance of the evidence which is a fact which should not be assumed by the Court."

The requirement in R.C.S. Art. 2185, that objections to the charge be presented to the court before the charge is read to the jury was enacted in 1913 in response to a widespread demand that the judge trying the case be given an opportunity to amend or correct the charge and thereby avoid the necessity of a new trial or reversal; which theretofore had often been occasioned by inadvertence. This provision has been repeatedly held to require that objections be clearly and distinctly stated, with the objective of having the attention of the trial judge and opposing counsel drawn to the specific points in the charge sought to be corrected. The method adopted by the Federal in this case is one which has grown all too frequent in recent years, and is manifestly a studied effort to get reversible error into the record instead of to get the case submitted upon correct rules of law. To consider objections so made but gives countenance and encouragement to a practice which should be discountenanced and discouraged. This court has heretofore pointed out on several occasions that the State, as well as the litigants, is vitally interested in an economic and expeditious administration of justice. The growing prolixity of records on appeal is one of the major causes of expense and delay in the appellate courts; and reversals add materially to expense and delay in both trial and appellate courts. The latter should be obviated as far as practical by obtaining a fair trial on the merits of the case in the first instance. The purpose of appeal is to insure such fair trial; and where it has been denied over the timely protest and to the injury of the appealing party, to order a new trial. The method of objection to the issue adopted in this case, manifesting as it does, a planned effort to conceal the only objection considered of sufficient merit to be brought forward in the brief, does not evidence a bona fide purpose on the part of appellant to obtain a correction of this issue in this particular in the trial court.

There is still another ground upon which we overrule the assignments of error supporting the third and fourth "subjects" above. The brief contains 109 assignments which cover the last 47 pages of the 262-page brief. The first three propositions in the brief relate to the fourth "subject", and, as stated in parenthesis at the end of each, are "germane to assignment of error No. 1." The next three propositions relate to the third "subject" and are parenthetically stated to be "germane to assignments of error Nos. 2 and 109." We are copying these three assignments in an appendix. The first two are manifestly grossly multifarious. The 109th besides being too general to be considered is wholly without merit.

The trial court's judgment is affirmed.

Affirmed.