96 Cal.App.2d 876 (1950)
216 P.2d 882
CALIFORNIA STATE AUTOMOBILE ASSOCIATION INTER-INSURANCE BUREAU, Appellant,
v.
WALLACE K. DOWNEY, as Insurance Commissioner, etc., Respondent.
Docket No. 14078.
Court of Appeals of California, First District, Division One.
April 10, 1950.
*878 Brobeck, Phleger & Harrison for Appellant.
Fred N. Howser, Attorney General, T.A. Westphal, Jr., and Harold B. Haas, Deputy Attorneys General, for Respondent.
John Adams, Jr., R.J. Reynolds, Sidney B. Weinstock, Leland B. Groezinger, Perry H. Taft, Don R. Sessions, Alexander, Bacon & Mundhenk, T. Parker Lowe, Keith, Creede & Sedgwick, W.M. Scott, Arthur Park, Hadsell, Sweet, Ingalls & Murman, Albert J. Morrissey, Edwin A. Heafey, Charles H. Goebel, Hagar, Crosby & Crosby and Richard E. Reese as Amici Curiae on behalf of Respondent.
PETERS, P.J.
The Insurance Commissioner of California suspended the right of the California State Automobile Association Inter-Insurance Bureau to transact the automobile liability insurance business in this state because of the refusal of the bureau to subscribe to or participate in the California Automobile Assigned Risk Plan. (Cal. Admin. Code, title 10, §§ 2400-2498.) This plan had been approved and promulgated by the commissioner under the claimed authority of the Assigned Risk Law. (Stats, 1947, chap. 1205, p. 2714; Ins. Code, §§ 11620-11627.) Pursuant to section 11523 of the Government Code as amended in 1947, the bureau sought, by mandate, to compel the commissioner to restore its right to do business. *879 From a judgment denying the petition for this writ the bureau appeals.
There are no substantial controverted factual issues presented on this appeal. The basic contentions of appellant are that the Assigned Risk Law is unconstitutional and that, as applied to appellant, the Assigned Risk Plan is invalid.
The issues presented are of vital importance to those engaged in the automobile insurance industry, and to various segments of the public. This interest is partially reflected in the fact that amici curiae briefs have been filed, all in support of respondent, by 81 companies writing automobile insurance in California, another by an attorney representing the California Association of Insurance Agents, the Insurance Brokers Society of Southern California, and The Society of Insurance Brokers, while still another on behalf of The National Association for the Advancement of Colored People. These briefs, as well as the excellent briefs prepared by counsel for both litigants, and the two oral arguments, have been of great assistance to the court in deciding the somewhat complex questions presented.

Background of Appellant
The California State Automobile Association was organized and incorporated in 1907 as a motor club for the purpose of advancing the interests of the motoring public. By the year 1914, many of its members requested that the association care for their automobile insurance needs. Many members felt that the rates charged by the private companies were high and unsatisfactory. The association, in the year mentioned, created appellant, the California State Automobile Association Inter-Insurance Bureau, in order to offer to its membership a plan of automobile insurance at a lower cost than the then prevailing rates.
The bureau is somewhat difficult to classify. It is a reciprocal or inter-insurance exchange. It is open only to members of the association. Its executive body, called the "Insurance Board" is elected by the board of directors of the association, and is composed of the same number of members as the board of directors of the association. Participation by the members of the association is voluntary. Each member desiring to join the bureau executes a power of attorney to the same agent, authorizing him or it to enter into agreements of insurance. The members act as insurers of one another. No premiums, as such, are paid. Each member makes an annual deposit which *880 is credited to him. The deposit fund is used to pay losses and expenses, for which purposes a proportionate amount is deducted from the deposit of each member. The operations of such organizations are regulated by sections 1280 to 1530 of the Insurance Code.
In many ways such an organization resembles a mutual insurance corporation. Its basic differences from such an organization are in mechanics of operation and in legal theory, rather than in substance. Appellant asserts that it is not a legal entity, which is undoubtedly technically correct. Obviously, it provides for a form of cooperative insurance by means of a joint venture or limited partnership. For various purposes, the law has treated such an organization as if it were a separate entity. Thus, persons, natural or corporate, holding the powers of attorney must procure a certificate of authority from the Insurance Commissioner (Ins. Code, § 1350); its finances are minutely regulated (Ins. Code, §§ 1370-1375); it can sue or be sued in its own name (Ins. Code, § 1450); a member or subscriber cannot be sued on any obligation contained in the power of attorney until a final judgment against the inter-insurance bureau has been unsatisfied for 30 days (Ins. Code, § 1451); all moneys received from members and not returned are subject to the gross premium tax placed on insurance companies (Ins. Code, § 1530; Industrial Indem. Exch. v. State Bd. of Equalization, 26 Cal.2d 772 [161 P.2d 222]); and for purposes of liquidation it is an entity (Mitchell v. Pacific Greyhound Lines, 33 Cal. App.2d 53 [91 P.2d 176]).

History of the Assigned Risk Law
The tremendous increase in the number of motor vehicles in recent years, the great number of automobile accidents, the enormous loss to the persons injured where the person at fault is uninsured and unable to respond in damages, and the natural desire of the automobile insurance companies to keep their losses down by limiting their policies to selected risks, have created many problems which the legislatures of many states have studied and attempted to solve. Nearly every state provides for the licensing of drivers, and many for their careful examination to weed out the unfit. Some states have provided for compulsory insurance as a prerequisite to the issuance of a driver's license, while others have provided a form of limited compulsory insurance by requiring certain persons to give proof of financial responsibility before they may secure a license to drive.
*881 The California Legislature has given much thought to this problem. As early as 1929, it adopted a statute providing for the suspension of the license to operate a motor vehicle of certain persons for various reasons, including the failure of a driver or owner to pay a final judgment of $100 or more for personal or property damage arising out of the operation of a motor vehicle. (Stats. 1929, chap. 258, § 4, p. 560.) This portion of the statute has been several times amended and has been codified in the Vehicle Code as section 410. The entire act is now found in sections 410 to 420 of the Vehicle Code. The act provides that one against whom such a judgment has been secured can lift the suspension only by paying the judgment and establishing his ability to pay claims that may arise from future accidents. Such ability to pay may be established by proof that the person involved is now insured, or he may post a surety bond, or he may deposit $11,000 in cash with the State Treasurer.
Another step in the same direction was taken in 1935. In that year, the City Carriers' Act was adopted. (Stats. 1935, chap. 312, p. 1057.) That act applies to highway carriers operating in any city of the state, and requires such operators to secure liability insurance, or give other evidence of financial responsibility, as a condition prerequisite to securing a permit to operate trucks for hire.
These statutes had one effect that was perhaps not foreseen by the Legislature, and that was that many competent drivers, many of whom depended for a living upon driving a motor vehicle, were prevented from operating motor vehicles because of their inability to secure an insurance policy or to give other proof of their financial responsibility. This was particularly true of a large number of small truck operators to whom insurance companies were reluctant to issue policies and who could not make the $15,000 cash deposit required. Many of these operators were refused insurance not because they were bad drivers, or not because they had a bad accident history or criminal record, but simply because many insurance companies believed that small truck operators, as a class, were a bad risk in view of the unfavorable loss ratios caused by the increasing accident rate, large jury verdicts, etc. Other large groups of drivers who apparently had difficulty in securing or were unable to secure insurance were violators of traffic laws, members of minority groups, particularly the colored drivers, persons with minor physical disabilities, the young and the old *882 drivers, and, of course, those who had bad accident records.
Such a situation created much hardship and many inequities, and various solutions were offered to the Legislature, one of which was that the state go into the insurance business and assume these and other risks. This was a solution opposed and feared by the insurance companies. Faced with these various pressures, in 1942, all insurance companies, handling automobile insurance in California, including appellant, adopted a voluntary "assigned risk" plan, which provided a method for insuring some, but not all, of the groups that were unable, otherwise, to secure insurance. This plan was approved by the State Insurance Department and became effective July 1, 1942. Under this plan, approved applicants for insurance were allocated to the subscribing insurers in proportion to the amount of automobile insurance written by each subscribing insurer the preceding year. In 1943, the Legislature facilitated the operation of the plan and recognized it by enacting sections 1110 to 1113 of the Insurance Code.
This voluntary plan alleviated, in some degree, the situation created by the statutes of 1929 and 1935, but it was only a partial palliative. It was strictly limited to persons required to procure and maintain insurance in order to operate their automobiles or trucks. Other persons who for one reason or another were deemed greater than ordinary risks by insurers were not covered by the voluntary plan.
Appellant, as already mentioned, was a subscriber to the voluntary plan, but all during the time it participated it adhered, strictly, to its policy of insuring only members of the California State Automobile Association, some of whom were members of the restricted groups. Late in 1946 or early in 1947, appellant withdrew from the plan. This immediately imperilled the soundness of the voluntary plan. One of the largest insurers in the state was refusing to take a share of the assigned risks, thus increasing the proportionate number other insurers were expected to take. The other insurers were reluctant to continue the voluntary plan under such circumstances. In this emergency the Legislature, then in session, promptly acted. It passed, as an emergency measure, the Compulsory Assigned Risk Law (Stats. 1947, chap. 39, p. 525) which became effective February 17, 1947. It provided that, after consultation with insurers writing automobile insurance, the commissioner shall approve "a reasonable plan for the equitable apportionment among such insurers of applicants for automobile ... insurance who are in good faith entitled *883 to but are unable to procure such insurance through ordinary methods." Upon the adoption of such a plan "all such insurers shall subscribe thereto and shall participate therein." The Legislature declared the act to be an urgency measure "necessary for the immediate preservation of the public peace, health and safety," and declared the nature of the emergency in the following language:
"Under provisions of the Vehicle Code, certain persons who have been involved in motor vehicle law violations are required to file insurance policies or other evidence of financial responsibility with the State in order to continue lawfully to operate motor vehicles upon the public highways of the State.
"Because insurers are naturally reluctant to grant insurance to such persons, it has been necessary to devise a plan for allocating such risks upon an equitable plan to the insurers engaged in the business. Such a plan, dependent upon the voluntary consent of all insurers, has been in effect for a number of years, but has recently ceased to operate because of the withdrawal of one of the subscribing insurers.
"Unless this act takes immediate effect, many persons who are insured under the former plan will be deprived of their insurance and those seeking to obtain such insurance will be unable to do so. Both classes will be deprived of the opportunity to operate motor vehicles upon the public highways, with a consequent loss in earning power in many cases and serious hardship in others; or in the alternative may continue to operate such vehicles in violation of the law, with a resultant increased burden on law enforcement agencies and a probable increase in disrespect for law."

Present Compulsory Assigned Risk Law
The above statute was amended by the same Legislature that had passed the emergency act (Stats. 1947, chap. 1205, p. 2714), by amending section 11620 of the Insurance Code and enacting sections 11621-11627 of that code. It is these statutes, and the plan adopted pursuant thereto, that are attacked by appellant in this proceeding. Section 11620, as then amended, provides in part as follows: "The commissioner, after a public hearing, shall approve or issue a reasonable plan for the equitable apportionment, among insurers admitted to transact liability insurance, of those applicants for automobile bodily injury and property damage liability insurance who are in good faith entitled to but are unable to procure such insurance through ordinary methods. The commissioner may approve *884 or issue reasonable amendments to such plan if he first holds a public hearing to determine whether the amendments are in keeping with the intent and purpose of this section. All such insurers shall subscribe to the plan and its amendments and, subject to Section 11621, participate therein."
Provision is then made in the section for a statutory notice of hearings on the proposed plan. Section 11621, after providing that assignments of risks shall not be made in certain instances not here involved, then states: "In so far as possible, assignments under the plan shall be consistent with the scope of territorial operations and underwriting policies of each subscriber." Section 11622 provides the amount of coverage required, while section 11623 authorizes the subscribing insurers to "form their own organization which shall, subject to review by the Insurance Commissioner, administer and operate the plan." Section 11624 provides that the plan adopted pursuant to the statute shall contain:
"(a) Standards for determining eligibility of applicants for insurance, and in establishing such standards the following may be taken into consideration in respect to the applicant ...
"(1) His criminal conviction record;
"(2) His record of suspension or revocation of a license to operate an automobile;
"(3) His automobile accident record;
"(4) His age and mental, physical and moral characteristics which pertain to his ability to safely and lawfully operate an automobile;
"(5) The condition or use of the automobile.
"(b) Procedures for making application for insurance, for apportionment of eligible applicants among the subscribing insurers and for appeal to the commissioner by persons who believe themselves aggrieved by the operation of the plan,
"(c) Rules and regulations governing the administration and operation of the plan,
"(d) Provisions showing the basis upon which premium charges shall be made and
"(e) Such other provisions as may be necessary to carry out the purpose of this article."
Section 11625 provides that if any insurer fails to subscribe to the plan, the commissioner shall give such company 10 days' written notice to subscribe. If the insurer still refuses to participate, the commissioner "may, after hearing upon notice, suspend the certificate of authority of such insurer *885 to transact liability insurance in this State until such insurer does so subscribe." Section 11626 provides for discipline of subscribers who violate the plan, while section 11627 provides that the term "insurer" includes "reciprocal or interinsurance exchanges."
At the same session of the Legislature that passed this statute there was also passed the Highway Safety Responsibility Law. (Stats. 1947, chap. 1235, p. 2738, adding §§ 419 to 420.9 to the Vehicle Code.) This law provides for the suspension, regardless of fault, of the license of the operator of any motor vehicle involved in an accident within the state in which injury to any person, or property damage in excess of $100 results unless the operator is insured or puts up a cash deposit. This law greatly aggravated the need for an assigned risk plan because it tremendously increased the number of persons required to carry insurance or give other evidence of their financial responsibility.

The Assigned Risk Plan
The commissioner, acting pursuant to the provisions of the Assigned Risk Law, held a hearing in October of 1947, on an assigned risk plan proposed by the automobile insurers operating in this state. Appellant appeared at that hearing and attacked the constitutionality of the Assigned Risk Law, but also stated that it would give consideration to accepting the plan voluntarily if the proposed plan were modified so as to give recognition to appellant's policy of insuring only members of the California State Automobile Association. This condition was not acceptable to the commissioner nor to the committee. The plan was adopted without such a provision, and appellant refused to subscribe to it. The commissioner, acting pursuant to section 11625 of the Insurance Code, suspended appellant's permit to transact automobile liability insurance in California. The appellant sought to review and annul this order of suspension by means of a petition for writ of mandate filed in the superior court. That court denied the petition and appellant has appealed. By stipulation of counsel, and by order of this court, the operation of the suspension order was stayed pending the final determination of the case on appeal. (Code Civ. Proc., § 1094.5f.)

Provisions of the Challenged Plan
Before directly discussing the contentions of appellant, reference should be made to the general provisions of the *886 Assigned Risk Plan. The plan is to be found in the California Administrative Code, title 10, sections 2400 to 2498.
The plan is available to all residents of California and to nonresidents using automobiles registered in this state. (§ 2404.) Policies issued under the plan shall provide a $5,000-$10,000 coverage. (§ 2406.) The plan is to be administered by a committee of five elected by the insurers and representing the various types of insurers doing business in this state. (§§ 2421 and 2421.1.) The committee appoints a manager who is to be the administrative executive of the plan and who makes all assignments of risk. (§ 2422.) Applicants "who are in good faith entitled" to insurance but are unable to procure it through ordinary channels, are eligible. (§ 2430.) The same section provides that an applicant shall be deemed to be in good faith entitled to insurance unless he is within certain specified categories. The excluded categories include those who, within three years prior to their application, have been convicted more than once of any of the following offenses:
a. Failing to stop and report when involved in an accident.
b. Manslaughter or negligent homicide resulting from operation of the vehicle.
c. Theft or unlawful taking of a vehicle.
d. Any felony in which an automobile was used.
e. Driving under the influence of liquor and causing death or bodily injury to another.
f. Driving while licenses are suspended or revoked.
g. Permitting unlawful use of driver's license or any other offense under section 338 of the Vehicle Code (§ 2431.1); or within the same three-year period has been convicted more than twice of:
a. Driving while intoxicated or under the influence of liquor.
b. Driving in a reckless manner where injury to person or property results.
c. Driving at excessive rate of speed where injury to person or property results. (§ 2431.)
It is also provided that other persons not "in good faith entitled" to insurance are:
1. Those addicted to use of drugs. (§ 2431.1a.)
2. Those habitually using alcohol to excess. (§ 2431.2a)
3. Those failing to disclose serious motor accidents or traffic violations in their applications. (§ 2431.3.)
*887 4. Those found to have operated vehicle more than once while license was suspended or revoked. (§ 2431.3a.)
5. Those with defective automobiles who have failed to repair them at the committee's demand. (§ 2431.4.)
6. Those who failed to pay insurance premiums on automobile insurance during the past year. (§ 2431.5.)
7. Those with a major mental or physical disability. (§ 2431.5a.)
8. If the risk consists of or includes a vehicle carrying passengers for compensation. (§ 2431.6.)
9. If the risk consists of a vehicle used in transporting explosives, gasoline or other highly inflammable or explosive materials. (§ 2431.6a.)
10. Those under 18 who cannot show hardship. (§ 2431.7a.)
11. Those whose driving would, in the opinion of the committee, endanger public safety. The entire history of the applicant may be examined in making such a determination. (§ 2431.8.)
Section 2445.1 provides: "Insofar as possible, assignments shall be consistent with the scope of territorial operations and underwriting policies of each insurer, of which the Manager shall have been notified in writing. Underwriting policy is policy founded on underwriting judgment of the hazards involved. Without in any way limiting or enlarging the meaning of the term `underwriting policy,' policy excluding from insurance an applicant solely by reason of the fact of his non-membership in an organization is not underwriting policy. Underwriting policy excluding from insurance applicants solely by reason of facts or circumstances not sufficient to render them not in good faith entitled, under this Plan, to insurance is inconsistent with the purposes of this Plan and of the statute under which it is approved and issued."
The only other section now necessary to mention is section 2461 which provides that: "If the experience, physical or other condition of any risk assigned under the Plan is such as makes the hazard of the risk greater than that contemplated by ... [the normal rates] ... the insurer ... may charge such rates and minimum premiums as are commensurate with the greater hazard of the risk, subject to the approval of the Committee."

Constitutional Arguments of Appellant
Appellant directs its main arguments against sections 11620 and 11627 of the Insurance Code, contending that, for various *888 reasons, those sections deny to it due process of law in violation of the Fourteenth Amendment to the United States Constitution. The arguments can be summarized as follows:
It is urged that the insurance business is not a public calling; that while the United States Supreme Court, in German Alliance Ins. Co. v. Lewis, 233 U.S. 389 [34 S.Ct. 612, 58 L.Ed. 1011], upheld the regulation of charges made by such companies, that decision is predicated upon the assumption that insurance companies cannot be compelled to make contracts against their will; that the present statute compels appellant to enter into contracts against its will and thus treats appellant, a private business, as if it were a public utility; that although a business may be impressed with a public interest so as to be subject to state regulation, the right thus to regulate does not include the power of the state to compel businesses that have not dedicated their property to the public to enter into contracts against their will. (Allen v. Railroad Commission, 179 Cal. 68, 88 [175 P. 466, 8 A.L.R. 249], is cited in support of this contention.)
Appellant next argues that, even in the public utility field, one who serves only a limited group cannot be compelled to serve others. In this connection reliance is placed on a line of cases which hold that a private carrier cannot be compelled to accept business, but may refuse service on the basis of convenience. (Forsyth v. San Joaquin Light etc. Corp., 208 Cal. 397 [281 P. 620]; Morel v. Railroad Commission, 11 Cal.2d 488 [81 P.2d 144], and Stephenson v. Binford, 287 U.S. 251 [53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721], are typical of the cases cited to support this argument.) It is then argued that, even if the insurance business were subject to the same degree of control as a public utility, appellant cannot be compelled to accept nonmember risks because appellant has heretofore restricted its operations to contracting only with members of the California State Automobile Association. Thus, it is contended, appellant is not a public insurer, and cannot be compelled to serve others. The power to regulate does not include the power to compel a company to furnish service. Such cases as Associated etc. Co. v. Railroad Commission, 176 Cal. 518 [169 P. 62, L.R.A. 1918C 849]; Allen v. Railroad Commission, 179 Cal. 68 [175 P. 466, 8 A.L.R. 249]; Frost v. Railroad Commission, 197 Cal. 230 [240 P. 26], reversed in 271 U.S. 583 [46 S.Ct. 605, 70 L.Ed. 1101, 47 A.L.R. 457]; Morel v. Railroad Commission, 11 Cal.2d 488 [81 P.2d 144]; Cudahy Packing Co. v. Johnson, 12 Cal.2d 583 [86 P.2d 348]; Trask v. *889 Moore, 24 Cal.2d 365 [149 P.2d 854]; Ocean Park etc. Corp. v. Santa Monica, 40 Cal. App.2d 76 [104 P.2d 668, 879], and others (see, also, note 175 A.L.R. 1333), are relied upon as establishing the principle that a statute which subjects a contract carrier to the burdens of a public utility violates the due process clause. This principle is peculiarly applicable to cooperatives, according to appellant, it being contended that a cooperative cannot be regulated like a public utility. (Frost v. Railroad Commission, 271 U.S. 583 [46 S.Ct. 605, 70 L.Ed. 1101, 47 A.L.R. 457]; Hissem v. Guran, 112 Ohio St. 59 [146 N.E. 808]; State v. Nelson, 65 Utah 457 [238 P. 237, 42 A.L.R. 849]; Garkane Power Co. v. Public Service Commission, 98 Utah 466 [100 P.2d 571, 132 A.L.R. 1490], are cited in support of this proposition.)
It is next urged that the fact that a license is required does not give the state the power to deny to appellant the privilege of doing business or exacting an improper price for its approval. (Frost v. Railroad Commission, supra; Danskin v. San Diego Unified Sch. Dist., 28 Cal.2d 536 [171 P.2d 885]; Union Pacific R.R. Co. v. Public Service Commission, 248 U.S. 67 [39 S.Ct. 24, 63 L.Ed. 131], are supported as establishing this proposition.)
Finally, it is argued that the plan is not essential to the Financial Responsibility Law; that it forces the members of the association to pay for injuries caused by nonmember drivers who are bad risks, and that, in effect, the plan constitutes an attack on a non-profit cooperative by its competitors. For these and other reasons appellant urges that the plan violates its constitutional rights.

Discussion of the Constitutional Arguments
Most of the cases cited by appellant deal only with the application of general rules to the particular facts there involved, and are applicable here, if at all, only indirectly by way of analogy. Appellant does, however, cite one case that contains language that directly upholds its position. That case is Employers' Liability Assur. Corp. v. Frost, 48 Ariz. 402 [62 P.2d 320, 107 A.L.R. 1413] decided in 1936, by the Arizona Supreme Court. (An annotation on the case is to be found in 107 A.L.R. 1421, and a supplementary annotation in 123 A.L.R. 139.) The Frost case involved a state statute which compelled insurance companies writing workmen's compensation insurance to accept all applications, and to waive the right to investigate and inform itself of the risks and hazards *890 incident thereto. The court, among other things, held that the statute violated the freedom to contract right guaranteed by the Fourteenth Amendment. The court pointed out that (p. 324 [62 P.2d]): "The courts have gone far in upholding the right of the state to regulate and control insurance business within its boundaries, but we have found no case where the facts, as here, call for a decision upon the power of the Legislature to make it mandatory upon an insurance company qualifying under its laws to carry a certain kind of insurance to insure all risks of that kind `for which application may be made to it which are not prohibited by law.'" This case is contrary to the decisions of the Supreme Judicial Court of Massachusetts, and of the Supreme Court of Texas, decisions which had been rendered when the Arizona court decided its case in 1936, but which are not referred to by it. (See In re Opinion of the Justices (1925), 251 Mass. 569 [147 N.E. 681]; Harris v. Traders' & General Ins. Co. (1935), (Tex. Civ.App.) 82 S.W.2d 750; Texas Employers' Ins. Ass'n. v. U.S. Torpedo Co. (1928), (Tex. Civ.App.) 8 S.W.2d 266, aff. in 1930 in 26 S.W.2d 1057; see, also, the later Massachusetts case of Factory Mut. Liability Ins. Co. v. Justices of Superior Court (1938), 300 Mass. 513 [16 N.E.2d 38], and the later, 1939, Texas case of Federal Underwriters Exchange v. Walker, (Tex. Civ.App.) 134 S.W.2d 388.) Several of these cases will be discussed later.
The Arizona Supreme Court, as an alternative ground for its decision, pointed out that the Arizona State Compensation Insurance Fund was allowed, but not compelled, to accept insurance from employers. After quoting the pertinent portion of the statute so providing the court stated (p. 323 [62 P.2d]): "This language is permissive and not mandatory. The provisions of section 1422, however, leave to insurance companies no alternative; they must write all applications. There is no reason, real or apparent, for this provision unless it be that it was put into the law as a deterrent to private insurance companies to enter the field of compensation insurance in competition with the state compensation fund. If that was the motive, the law should have prohibited insurance companies from selling compensation insurance in Arizona and not undertaken to compel them to insure all applications regardless of the hazards." This ground of the decision is undoubtedly sound; the freedom of contract argument is not.
The difficulty with appellant's argument, and with the *891 Arizona case, is that they disregard or treat cavalierly, most of the relatively recent constitutional law cases dealing with the subject of the police power, and rely upon the earlier cases containing a very restricted viewpoint of the state's police power. Thus, many of the principles discussed in Frost v. Railroad Commission, 271 U.S. 583 [46 S.Ct. 605, 70 L.Ed. 1101, 47 A.L.R. 457], and Michigan Pub. Util. Com. v. Duke, 266 U.S. 570 [45 S.Ct. 191, 69 L.Ed. 445], relied upon by appellant, which cases held that a contract carrier could not be subjected to the burdens imposed on a public utility, were drastically modified as early as 1932 in Stephenson v. Binford, 287 U.S. 251 [53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721]. That case, and those following it, have held that if the business is affected with a public interest (and the insurance business is  German Alliance Ins. Co. v. Lewis, 233 U.S. 389 [34 S.Ct. 612, 58 L.Ed. 1011]), the validity of the regulation depends primarily upon whether the challenged legislation is reasonably appropriate to the ends sought to be attained.
Starting in 1934, with the case of Nebbia v. New York, 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940], there has been a marked development and advance in the attitude of the United States Supreme Court towards regulatory legislation. That case held that the State of New York could, by statute, fix the minimum and maximum sales prices of milk in that state. Nebbia argued that such a statute violated the due process and equal protection clauses of the Fourteenth Amendment. Some of the comments of Mr. Justice Roberts, the author of the majority opinion, are peculiarly applicable to the present case. Thus, at page 523 it is stated: "Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest."
And at page 525: "The Fifth Amendment, ... and the Fourteenth, ... do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of *892 due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be obtained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts."
And at page 527: "The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned.... And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency."
Nebbia argued that the milk industry was not a public utility, and that the public power over rates could be validly exercised only over business affected with a public interest  that is, according to Nebbia, only over public utilities. The court conceded that the milk industry was not a public utility, but held that it was a business affected with a public interest and therefore subject to regulation. Quoting from Munn v. Illinois, 94 U.S. 113 [24 L.Ed. 77], the court (p. 533) held that: "`Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large.'" On the same page this thought was expressed: "Thus understood, `affected with a public interest' is the equivalent of `subject to the exercise of the police power'; and it is plain that nothing more was intended by the expression." Still referring to the Munn case, the court continued the discussion as follows (p. 533):
"In the further discussion of the principle it is said that when one devotes his property to a use, `in which the public has an interest,' he in effect `grants to the public an interest in that use' and must submit to be controlled for the common good. The conclusion is that if Munn and Scott wished to avoid having their business regulated they should not have embarked their property in an industry which is subject to regulation in the public interest.
"The true interpretation of the court's language [in Munn v. Illinois] is claimed to be that only property voluntarily de voted to a known public use is subject to regulation as to rates. But obviously Munn and Scott had not voluntarily *893 dedicated their business to a public use. They intended only to conduct it as private citizens, and they insisted that they had done nothing which gave the public an interest in their transactions or conferred any right of regulation. The statement that one has dedicated his property to a public use is, therefore, merely another way of saying that if one embarks in a business which public interest demands shall be regulated, he must know regulation will ensue."
In further discussing this subject, the court directly discussed the insurance business. It pointed out that, because of the great need for insurance protection, and because competing insurers had agreed upon a fixed schedule of rates, the court had upheld, in German Alliance Ins. Co. v. Lewis, 233 U.S. 389 [34 S.Ct. 612, 58 L.Ed. 1011], a statute fixing the premium rates on fire insurance. Still referring, by analogy, to the field of insurance, the court, at page 535, stated: "Many other decisions show that the private character of a business does not necessarily remove it from the realm of regulation of charges or prices.... Insurance agents' compensation may be regulated, though their contracts are private, because the business of insurance is considered one properly subject to public control."
And at page 536 it stated: "It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory.... The phrase `affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good.... These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells.
"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without *894 authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio. `Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' Northern Securities Co. v. United States, 193 U.S. 197, 337-8 [24 S.Ct. 436, 48 L.Ed. 679.] And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal."
The Nebbia case has been frequently cited with approval, and its doctrine of state power over business and industry steadily expanded. Whenever a state determines, in good faith, that a practice of an industry is injurious to the public, the state may control the practice even where the legislation directly affects the internal affairs of a business or industry, as long as the legislation is neither arbitrary nor discriminatory. A few citations and examples will serve to illustrate the extent of this control.
In Lincoln Federal Labor Un. v. Northwestern I. & M. Co., 335 U.S. 525, 536 [69 S.Ct. 251, 93 L.Ed 212, 6 A.L.R.2d 473], the court stated: "This Court beginning at least as early as 1934, when the Nebbia case was decided, has steadily rejected the due process philosophy enunciated in the Adair-Coppage line of cases [208 U.S. 161 (28 S.Ct. 277, 52 L.Ed. 436)]. In doing so it has consciously returned closer and closer to the earlier constitutional principle that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law. [Citing cases.] Under this constitutional doctrine the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare."
In West Coast Hotel Co. v. Parrish, 300 U.S. 379 [57 S.Ct. *895 578, 81 L.Ed. 703, 108 A.L.R. 1330], the court upheld the constitutionality of the State of Washington's minimum wage law for women and minors. The court reiterated the principle that freedom of contract is a qualified and not an absolute right, and again stated that the test of unconstitutionality was whether the legislation was arbitrary or capricious, "that is all we have to decide." (P. 399.)
In Osborn v. Ozlin, 310 U.S. 53 [60 S.Ct. 758, 84 L.Ed. 1074], the court upheld the constitutionality of a Virginia statute which provided that insurance companies doing a casualty and risk business within the state must handle such insurance "through regularly constituted and registered resident agents or agencies of such companies," and that such resident agents should receive the usual commissions and could not share more than one-half of a commission with a nonresident licensed broker. Speaking of the power which the state has over the regulation of insurance companies, the court said (p. 65): "It is not our province to measure the social advantage to Virginia of regulating the conduct of insurance companies within her borders insofar as it affects Virginia risks. Government has always had a special relation to insurance. The ways of safeguarding against the untoward manifestations of nature and other vicissitudes of life have long been withdrawn from the benefits and caprices of free competition. The state may fix insurance rates, ... it may regulate the compensation of agents, ... it may curtail drastically the area of free contract.... States have controlled the expenses of insurance companies.... They have also promoted insurance through savings banks.... In the light of all these exertions of state power it does not seem possible to doubt that the state could, if it chose, go into the insurance business, just as it can operate warehouses, flour mills, and other business ventures, ... or might take `the whole business of banking under its control,' .... If the state, as to local risks, could thus preempt the field of insurance for itself, it may stay its intervention short of such a drastic step by insisting that its own residents shall have a share in devising and safeguarding protection against its local hazards.... All these are questions of policy not for us to judge. For it can never be emphasized too much that one's own opinion as to the wisdom of a law must be wholly excluded when one is doing one's judicial duty. The limit of our inquiry is reached when we conclude that Virginia has exerted its powers as to matters within the bounds of her control."
*896 A case peculiarly applicable here is Hoopeston Can. Co. v. Cullen, 318 U.S. 313 [63 S.Ct. 602, 87 L.Ed. 777]. There the issue before the court was whether appellant reciprocal insurance associations (insurers against fire and other related risks) whose attorneys in fact were located in Illinois, could constitutionally be made subject to the laws of New York as a condition of insuring property in that state. After holding that New York had the power to regulate these companies, the court considered the question of whether the particular regulations objected to by the appellants were in violation of the due process clause. Particularly objected to by the appellants was a prohibition against making new agreements with subscribers who did not have assets in excess of ten thousand dollars. The court said (p. 321): "The appellants earnestly insist that theirs is a successful system of cooperative insurance which gives complete security with substantial economy to their members, and that their New York subscribers may lose the benefits of this form of insurance by reason of the reciprocals' inability to comply with the requirements of the New York law. That the reciprocals save for their members from 25 to 50 per cent of the cost of ordinary commercial insurance and that the members are well satisfied with the system they have created is not controverted by counsel for the state of New York. However persuasive such arguments might be if addressed to the state legislature, they present no constitutional barrier which prevents New York from enforcing these regulations if it chooses." (See, also, Hardware Dealers Mut. F. Ins. Co. v. Glidden Co., 284 U.S. 151 [52 S.Ct. 69, 76 L.Ed. 214].)
In California, it has been held that: "It is settled law of California that the business of insurance is one affected with a public interest." (Caminetti v. State Mut. Life Ins. Co., 52 Cal. App.2d 321, 324 [126 P.2d 165].) In that case the appellate court affirmed an order of the lower court refusing to vacate an order appointing the commissioner as conservator for a mutual insurance company where the evidence showed that the payment of a $1,000 monthly salary to the executive vice-president was hazardous to the company.
Many other cases could be cited, but these are sufficient to illustrate the trend of decisions. The above cases deal with general principles, and not with the specific problem here involved. But we are not without authority  state authority it is true  on the precise question. Massachusetts enacted a compulsory automobile insurance law requiring all drivers *897 to be licensed, and all licensed drivers to give security for civil liability growing out of the operation of motor vehicles. One form of approved security was a liability insurance policy. The statute, in detail, provided for the form of such policies by requiring them to contain certain provisions and prohibited others, and also regulated premiums. The statute also provided that if any applicant was refused a policy, or if his policy was canceled, he could apply to a statutory board of appeal which was authorized to determine if such refusal or cancellation was "reasonable," and whether the applicant was a "proper person" to whom a policy should be issued. If the board of appeal decided in favor of the applicant, the insurance company was required to issue a policy, and, upon refusal, its license to do business was to be suspended. In an advisory opinion to the Legislature  Opinion of the Justices, 251 Mass. 569 [147 N.E. 681]  the Supreme Judicial Court of Massachusetts held that the statute, in all respects, was constitutional. After holding that the business of automobile liability insurance affected the public interest, and after upholding the compulsory provisions of the act including the provisions relating to the content of the policies and the regulation of charges, etc., the court upheld the provision requiring insurance companies to issue policies to applicants found reasonably entitled to insurance by the board of appeals. At page 613 the court discussed this problem as follows: "The several features of the proposed bill set forth in the eighth question as provisos constitute serious limitations upon customary methods of conducting the insurance business. The question whether a particular risk shall be assumed by an insurer or surety is an important factor in the conduct of such business.... Character, physical capacity, sight, hearing, financial responsibility, record of past conduct, personal habits, nature and extent of business and general reputation are among the elements of essential significance in determining whether motor vehicle liability bonding or insurance for any particular applicant shall be undertaken. To subject the determination of such a vital question by an insurer or surety to review is a great interference with freedom of contract. The right to freedom of contract is secured as a general rule by the constitutions of the Commonwealth and Nation; but there are exceptions where legislative interference with that right is permissible. We are of opinion that the proposed *898 bill in this aspect does not transcend legislative power. The right of the citizen to register a motor vehicle whereby he may travel upon the ways is made strictly conditional upon his depositing cash or securities or upon procuring a motor vehicle liability policy or bond. This, too, is a great interference with freedom of action. The refusal by corporations to issue such policy or sign such bond may drive one out of business or seriously impair his convenience. Where such paramount interests are at stake with sole reference to the use of public ways provided wholly at the expense of the government, there is constitutional basis for legislative regulation to the end that no injustice may be done. Unwarranted discrimination may arise against certain applicants. Instances may arise of honest difference of opinion whether a policy or bond ought to be issued at all, or whether, after issuance, it ought to be cancelled. To provide an impartial administrative tribunal to settle such controversies, although going to the verge of power, cannot in our opinion be pronounced in excess of the authority conferred by the Constitution upon the General Court."
In Factory Mut. Liability Ins. Co. v. Justices of Superior Court, 300 Mass. 513 [16 N.E.2d 38], in a contested case, the highest court of Massachusetts upheld an order of the board of appeal ordering the insurance company to issue a policy to an applicant who had been refused a policy. There is some language in the opinion particularly applicable here. At page 40 [16 N.E.2d] the court stated:
"When our Legislature enacted the compulsory motor vehicle insurance law, by which all persons registering motor vehicles are required to provide security for the payment of claims for damages arising from their operation on the public ways, it foresaw the necessity for providing at the same time a procedure under which individuals could compel companies engaging in the business to insure them in the absence of sound reasons for refusal....
"... Nor can a company limit the power of the board and the court to determine whether a refusal is proper and reasonable under all the circumstances by insistence upon answers deemed by it to be satisfactory to such questions as it may see fit to include in an application blank. And it is plain that no company attempting to engage in this business can take the position that it will insure only pleasure vehicles or limit its operations to that part of the field in which there is the least risk and the most profit. The compulsory law contemplates, *899 and its successful operation requires, that as to their obligations to issue policies all companies alike should abide by the orders of the board or of the court." (Italics added.)
A similar statute has been upheld in Texas. (Harris v. Traders' & General Ins. Co., (Tex.Civ.App.) 82 S.W.2d 750; Texas Employers' Ins. Ass'n. v. U.S. Torpedo Co., (Tex.Civ. App.) 8 S.W.2d 266, aff. in 26 S.W.2d 1057; Federal Underwriters Exchange v. Walker, (Tex.Civ.App.) 134 S.W.2d 388.)
No further reference to the authorities need be made on this phase of the case. [1] The insurance business is one affected with a public interest, and subject to regulation. As long as the statute has a reasonable relation to a proper legislative purpose, and is neither arbitrary nor discriminatory, it is a valid enactment and cannot be successfully challenged under the due process clause of the federal Constitution. [2a] That a valid legislative purpose here existed is too clear to require extended discussion. For the protection of persons using the highways, the Legislature determined that certain drivers of motor vehicles had to be insured, or give security. Many in these affected groups could not secure a policy or give security. Their means of livelihood, in many cases, was jeopardized. Their right to use the highways was greatly limited. Some means whereby applicants in good faith entitled to insurance could get it, had to be provided. This could be done either by the state going into the insurance business, or by an assigned risk plan affecting all insurers. The Legislature determined to adopt the latter alternative. The Legislature also determined that such a plan could not operate successfully unless all companies writing liability policies were required to take their share of assigned risks. Otherwise, as pointed out by the Massachusetts court, supra, one company could select its risks, and thus gain what the Legislature has determined to be an unfair advantage over its competitors. Unless appellant is required to assume its share of the assigned risks on penalty of losing its license, it will gain an unfair advantage over its competitors. This is a phase of the insurance business clearly subject to regulation. [3] No company can be compelled to assume a risk. But if it refuses to accept an assigned risk, its right to do business in this state may be terminated. The cases heretofore cited clearly establish that the due process clause is no impediment to such a statute. The state's police powers clearly encompass such regulation.
*900 [4] The argument that such legislation compels appellant to enter into contracts of insurance against its will, and thus impairs appellant's constitutional right to freedom of contract, and destroys one of the essential elements of a contract  consent  has been fully answered in the cases cited above. The state has said that insurance companies that enter the liability field cannot limit their activities to the most profitable type of business, but must share proportionately the less profitable policies. This infringement on the freedom of contract is justifiable, for reasons already stated. [2b] The plan has a reasonable relation to a valid legislative purpose. It is not arbitrary, capricious, or discriminatory. There is therefore no violation of the due process clause.
Appellant, in the briefs and oral arguments, has laid much stress on the contention that, as applied to appellant, the statute compels it to render a service beyond the scope of its claimed dedication to the public service. The argument is fallacious. It is based on the theory that heretofore it has limited its policies to members of the California State Automobile Association, a select group. If appellant has "dedicated" its business to the public service, it has dedicated it to the writing of automobile liability insurance. [5] The extent of its "dedication" cannot be measured by its past customs or practices, but must be measured by the extent of its powers under the law. While appellant has heretofore only insured a select group, that does not mean that appellant has "dedicated" its business to that group. Under the law (Ins. Code, § 108) this company has the legal right to write automobile liability insurance on a statewide basis and for all applicants. That is the real extent of its "dedication."
[2c] Nor does the plan give the competitors of appellant any unfair advantage  in fact, to exclude appellant from the plan would be to give it a most unfair advantage over other companies. Appellant writes an appreciable proportion of the automobile liability insurance written in this state. To permit it to select its risks, and to deny that right to its competitors would be most unfair. The right of the state to regulate a mutual or reciprocal insurance company, and to compel such companies to abide by reasonable regulations applicable to all, is too clear to require further discussion. That is not discrimination  it is applying the rule of uniformity.

Delegation of Legislative Authority to the Commissioner
The second major contention of appellant is that the statute is invalid because it fails to provide an adequate yardstick *901 for the guidance of the commissioner, and thus unlawfully delegates to him legislative powers. There can be no doubt that it is the law that a valid statute cannot delegate unlimited powers to an administrative officer and that, to be valid, the statute must "`provide an adequate yardstick for the guidance of the executive or administrative body or officer empowered to execute the law.'" (Blatz Brewing Co. v. Collins, 69 Cal. App.2d 639, 645 [160 P.2d 37], quoting from 11 Am.Jur. 955, § 240; see, also, American Distilling Co. v. State Bd. of Equalization, 55 Cal. App.2d 799 [131 P.2d 609]; also see 24 Cal.L.Rev. 184; 23 Cal.L.Rev. 435; 8 So.Cal.L.Rev. 226, 255; 29 Cal.L.Rev. 110, 120.) It is this principle appellant seeks to here invoke.
The theory of appellant is that, under the statute, the commissioner is free to determine, at his arbitrary will, what types of applicants insurers will be compelled to insure, and what types they may refuse to insure. It will be remembered that section 11620 of the Insurance Code requires the commissioner to "approve or issue a reasonable plan for the equitable apportionment ... of those applicants for automobile bodily injury and property damage liability insurance who are in good faith entitled to but are unable to procure such insurance through ordinary methods." Section 11621 requires assignments under the plan "In so far as possible" to be "consistent with the scope of territorial operations and underwriting policies of each subscriber." Section 11624 requires the plan to contain "Standards for determining eligibility of applicants for insurance," and provides that the commissioner in establishing such standards "may" take into consideration five specified factors.
It is the basis of appellant's argument on this point that these statutes limit the commissioner in making assignments only to those "in good faith entitled," and that such words, in fact and in law, place no limitation at all upon the powers of the commissioner. It is claimed that section 11624 constitutes no limitation on the commissioner because its provisions are permissive and not mandatory. Such a statute provides no standard at all on the power of the commissioner, and constitutes an unlawful delegation of legislative power, according to appellant. Reliance is placed on such cases as Panama Refining Co. v. Ryan, 293 U.S. 388 [55 S.Ct. 241, 79 L.Ed. 446]; Schechter Corp. v. United States, 295 U.S. 495 [55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947]; State v. Hines, 163 Kan. 300 [182 P.2d 865].
*902 The rule that the statute must provide a yardstick to define the powers of the executive or administrative officer is easy to state but rather hard to apply. Probably the best that can be done is to state that the yardstick must be as definite as the exigencies of the particular problem permit.
The cases cited by appellant set out a pretty rigid standard. Very broad language can be found in them, but such language must be read in connection with the particular problem under discussion. There are several cases decided by the United States Supreme Court, more recent than those cited by appellant, where the problem is exhaustively discussed and where the principles to be applied are set forth at length. One such case is Lichter v. United States, 334 U.S. 742 [68 S.Ct. 1294, 92 L.Ed. 1694], where the court upheld the constitutionality of the Renegotiation Act. Under attack on the ground of unconstitutional delegation of legislative powers to administrative officers, was the section of the statute which provided that cabinet secretaries could renegotiate contracts under which "excessive profits" had been or would be realized, and further allowed the secretary to recover "excessive profits" paid to contractors under the renegotiated contracts. No definition of "excessive profits" was contained in the statute. The court held that the phrase "excessive profits" constituted a sufficient yardstick in view of its context, and because of the administrative practices later incorporated into the act, and the nature of the war power there being employed. Certainly, such a standard is far less definite than the one here employed. In discussing standards upheld in other cases the court stated (p. 786):
"The following, somewhat comparable, legislative specifications are among those which have been held to state a sufficiently definite standard for administrative action:
"`Just and reasonable' rates for sales of natural gas, ...; `public interest, convenience, or necessity' in establishing rules and regulations under the Federal Communications Act, ...; prices yielding a `fair return' or the `fair value' of property, ...; `unfair methods of competition' distinct from offenses defined under the common law, ...; `just and reasonable' rates for the services of commission men, ...; and `fair and reasonable' rent for premises, with final determination in the courts, ...."
Another leading case is Yakus v. United States, 321 U.S. 414 [64 S.Ct. 660, 88 L.Ed. 834], in which the court held that there was no unconstitutional delegation of power by Congress *903 to the Price Administrator in the Emergency Price Control Act of 1942. Section 1(a) described the general purpose of the act. By section 2(a), the Administrator was authorized to promulgate regulations fixing prices of commodities which "in his judgment will be generally fair and equitable and will effectuate the purposes of this Act" when in his judgment, their prices "have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act." The section also provided that "so far as practicable ... the Administrator shall ascertain and give due consideration to the prices prevailing between October 1 and October 15, 1941 ... and shall make adjustments for such relevant factors as he may determine and deem to be of general applicability, ..."
The statute was upheld as providing a sufficient standard. There is much stated in the opinion that is here applicable. At page 423 the court stated:
"Congress enacted the Emergency Price Control Act in pursuance of a defined policy and required that the prices fixed by the Administrator should further that policy and conform to standards prescribed by the Act. The boundaries of the field of the Administrator's permissible action are marked by the statute. It directs that the prices fixed shall effectuate the declared policy of the Act to stabilize commodity prices so as to prevent wartime inflation and its enumerated disruptive causes and effects. In addition the prices established must be fair and equitable, and in fixing them the Administrator is directed to give due consideration, so far as practicable, to prevailing prices during the designated base period, with prescribed administrative adjustments to compensate for enumerated disturbing factors affecting prices. In short the purposes of the Act specified in § 1 denote the objective to be sought by the Administrator in fixing prices  the prevention of inflation and its enumerated consequences. The standards set out in § 2 define the boundaries within which prices having that purpose must be fixed. It is enough to satisfy the statutory requirements that the Administrator finds that the prices fixed will tend to achieve that objective and will conform to those standards, and that the courts in an appropriate proceeding can see that substantial basis for those findings is not wanting.
"The Act is thus an exercise by Congress of its legislative power. In it Congress has stated the legislative objective, *904 has prescribed the method of achieving that objective  maximum price fixing , and has laid down standards to guide the administrative determination of both the occasions for the exercise of the price-fixing power, and the particular prices to be established." After distinguishing the Schechter case the court stated (p. 424):
"The Constitution as a continuously operative charter of government does not demand the impossible or the impracticable. It does not require that Congress find for itself every fact upon which it desires to base legislative action or that it make for itself detailed determinations which it has declared to be prerequisite to the application of the legislative policy to particular facts and circumstances impossible for Congress itself properly to investigate. The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct  here the rule, with penal sanctions, that prices shall not be greater than those fixed by maximum price regulations which conform to standards and will tend to further the policy which Congress has established. These essentials are preserved when Congress has specified the basic conditions of fact upon whose existence or occurrence, ascertained from relevant data by a designated administrative agency, it directs that its statutory command shall be effective. It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework....
"Nor does the doctrine of separation of powers deny to Congress power to direct that an administrative officer properly designated for that purpose have ample latitude within which he is to ascertain the conditions which Congress has made prerequisite to the operation of its legislative command. Acting within its constitutional power to fix prices it is for Congress to say whether the data on the basis of which prices are to be fixed are to be confined within a narrow or a broad range. In either case the only concern of courts is to ascertain whether the will of Congress has been obeyed. This depends not upon the breadth of the definition of the facts or conditions which the administrative officer is to find but upon the determination whether the definition sufficiently marks the field within which the Administrator is to act so that it *905 may be known whether he has kept within it in compliance with the legislative will."
At page 426 appears the following pertinent illustrations: "The authority to fix prices only when prices have risen or threaten to rise to an extent or in a manner inconsistent with the purpose of the Act to prevent inflation is no broader than the authority to fix maximum prices when deemed necessary to protect consumers against unreasonably high prices, sustained in Sunshine Anthracite Coal Co. v. Adkins, supra [310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263], or the authority to take possession of and operate telegraph lines whenever deemed necessary for the national security or defense, upheld in Dakota Central Tel. Co. v. South Dakota, 250 U.S. 163 [39 S.Ct. 507, 63 L.Ed. 910, 4 A.L.R. 1623]; or the authority to suspend tariff provisions upon findings that the duties imposed by a foreign state are `reciprocally unequal and unreasonable,' held valid in Marshall Field & Co. v. Clark, supra [143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294]." Other powers mentioned by the court as within the constitutional limitation are set forth on page 427 as follows: "... the power to approve consolidations in the `public interest,' ...; or the power to regulate radio stations engaged in chain broadcasting `as public interest, convenience or necessity requires' ...; or the power to prohibit `unfair methods of competition' not defined or forbidden by the common law, Federal Trade Commission v. Keppel & Bro., 291 U.S. 304 [54 S.Ct. 423, 78 L.Ed. 814]; ...; or the similar direction that in adjusting tariffs to meet differences in costs of production the President `take into consideration' `in so far as he finds it practicable' a variety of economic matters, sustained in Hampton & Co. v. United States, supra [276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624]; or the similar authority, in making classifications within an industry, to consider various named and unnamed `relevant factors' and determine the respective weights attributable to each, held valid in Opp Cotton Mills v. Administrator, supra [312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624]."
The United States Supreme Court has also commented on this problem in American Power & L. Co. v. Securities & Exch. Com., 329 U.S. 90 [67 S.Ct. 133, 91 L.Ed. 103]. The problem there involved and its solution are disclosed in the following quotation (p. 104):
"Section 11(b) (2) itself provides that the Commission shall act so as to ensure that the corporate structure or continued *906 existence of any company in a particular holding company system does not `unduly or unnecessarily complicate the structure' or `unfairly or inequitably distribute voting power among security holders.'" The objection that this was an insufficient standard was rejected.
At page 105 the court stated: "... These standards are certainly no less definite in nature than those speaking in other contexts in terms of `public interest,' `just and reasonable rates,' `unfair methods of competition' or `relevant factors.' The approval which this Court has given in the past to those standards thus compels the sanctioning of the ones in issue....
"The judicial approval accorded these `broad' standards for administrative action is a reflection of the necessities of modern legislation dealing with complex economic and social problems.... The legislative process would frequently bog down if Congress were constitutionally required to appraise beforehand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation. Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules; it then becomes constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. Private rights are protected by access to the courts to test the application of the policy in the light of these legislative declarations."
[6] Enough has been quoted to illustrate how similar problems have been handled by the highest court. It is clear that the fact that the commissioner has some discretion, is no valid constitutional objection to the statute. It is also clear that the Assigned Risk Law does not have to be considered in a vacuum. Other statutes in pari materia may, of course, be considered. The original Assigned Risk Law with its urgency clause, may be looked to in order to ascertain the legislative purpose. So too, we may properly consider the various statutes requiring insurance or security from certain automobile drivers. The background of the present statute, the problem it was designed to meet, the voluntary plan, its breakdown, all serve to give meaning and substance to the provisions of the statute under consideration. Thus, when section 11620 of the Insurance Code declares that it is the policy of the law to allow the commissioner to issue a plan for the equitable apportionment of applicants in good faith entitled *907 to insurance, the statute does not stand alone but must be considered in connection with its object and its background. If the statute was to be effective, great discretion had to be left to the commissioner to meet the various and complex problems with which he was to be presented. Rigid standards were not reasonably practicable. While the statute must furnish the administrator with a yardstick, it need not furnish a micrometer. The policy of the statute is clear. In our opinion, the yardstick furnished complies with constitutional requirements.

Does the Plan Violate the Statute?
The next contention of appellant is that, if it be assumed that the statute is valid, the plan actually adopted violates the provisions of the statute and is therefore void.
The appellant attacks the plan in several minor and one major respect. The first minor attack is against various provisions of the plan on the ground that certain distinctions made therein are arbitrary or discriminatory. None of these alleged discriminations operates against appellant. [7] It is elementary that only a member of the class discriminated against can attack the constitutionality of a plan on the charge of unconstitutional discrimination.
Another minor objection to the plan is the claim that it overlooks consideration of the record of applicants with respect to suspension or revocation of drivers' licenses. (Ins. Code, § 11624(a) (2).) However, appellant has apparently overlooked sections 2431.8 and 2431.8a of the plan, which provide that the application may be refused if the accident and conviction records are such that his operation of an automobile would endanger public safety, or if, on the basis of a thorough investigation of the applicant's record, reasonable doubt exists as to whether the applicant should be permitted to continue driving.
[8] The main attack against the plan is based on the last sentence of section 11621 of the Insurance Code which reads as follows: "In so far as possible, assignments under the plan shall be consistent with the scope of territorial operations and underwriting policies of each subscriber."
The plan provides (§ 2445.1) that "In so far as possible, assignments shall be consistent with the scope of territorial operations and underwriting policies of each insurer, of which the Manager shall have been notified in writing. Underwriting policy is policy founded on underwriting judgment of the *908 hazards involved. Without in any way limiting or enlarging the meaning of the term `underwriting policy,' policy excluding from insurance an applicant solely by reason of the fact of his non-membership in an organization is not underwriting policy. Underwriting policy excluding from insurance applicants solely by reason of facts or circumstances not sufficient to render them not in good faith entitled, under this Plan, to insurance is inconsistent with the purposes of this Plan and of the statute under which it is approved and issued." Appellant argues at length that this provision of the plan is invalid, indefinite and irrational. The argument, omitting certain technical attacks on the provision, none of which is sound, amounts to this  section 11621 of the Insurance Code requires that any plan adopted shall "In so far as possible" be consistent with the underwriting policies of the insurer. The policy of insuring only members of the California State Automobile Association is an underwriting policy of appellant. The plan (§ 2445.1) declares this not to be an "underwriting policy." The plan therefore violates the statute.
The obvious answer to appellant's argument is that all "underwriting policies" of an insurer do not have to be given recognition by the plan. Section 11621 of the Insurance Code does not compel the commissioner to embody all such underwriting policies into the plan. The language is "In so far as possible" such underwriting policies shall be considered in making assignments. If it be assumed that a policy or practice of writing insurance only for members of the association is an "underwriting policy," such policy is directly opposed to the purpose, intent and spirit of the statute. Certainly, section 11621 does not require the commissioner to embody into the plan a policy of a particular insurer that is violative of the statute. It is apparent that if membership in arbitrarily selected groups were to be recognized as a proper base of underwriting policy, the way would be open whereby any company could evade legitimate assignments on the ground that the particular applicant was not a member of the selected group. Thus, the entire purpose of the statute would be defeated.
It is apparent that the commissioner cannot have a plan providing for "equitable apportionment" of risks among all insurers unless he has the power to assign to appellant applicants who are nonmembers of the association. Section 2445.1a of the plan provides that when a member of the association applies for insurance under the plan, the member shall preferably *909 be assigned to appellant. However, appellant cannot refuse an applicant merely because he is not a member of the association. This would seem to be as "equitable" an apportionment as is possible without destroying the effect of the statute.
Thus, whether it be considered that the commissioner gave no consideration to appellant's policy of writing insurance only for members of the association, or that he gave such consideration "In so far as possible," the plan does not violate the statute.
The judgment appealed from is affirmed.
Bray, J., and Schottky, J. pro tem., concurred.
A petition for a rehearing and modification was denied May 10, 1950, and appellant's petition for a hearing by the Supreme Court was denied June 8, 1950.