**J. F. DICKSON, Appellant,**

v.

**R. P. DICKSON, Appellee.**

**No. 12432.**

Court of Civil Appeals of Texas, Austin.

Dec. 1, 1976.

Rehearing Denied Dec. 22, 1976.

Kirk Patterson, Mitchell & Stewart, San Antonio, for appellant.

Sander W. Shapiro, Barry K. Bishop, Clark, Thomas, Winters & Shapiro, Roy Q. Minton, John L. Foster, Jones, Blakeslee, Minton, Burton & Fitzgerald, Inc., Austin, for appellee.

SHANNON, Justice.

Appellee, Roberta Purvis Dickson, filed suit for divorce against appellant, Fagan Dickson, in the district court of Travis County. The parties also sought a disposition of their estate. After trial to a jury, judgment was entered granting the divorce and dividing the property. We will affirm that judgment.

Some aspects of this case have been considered previously by this Court in an appeal from certain temporary orders of the district court. *Dickson v. Dickson,* 516 S.W.2d 28 (Tex.Civ.App.1974, no writ).

The parties were married in December, 1947, and they separated in March, 1974. Prior to December, 1947, appellee was the widow of an early Austin entrepreneur, Malcolm Reed. She and Reed had two children, Roberta and Lucy. Appellant also had been married previous to 1947, and he had one child, James Dickson. Appellant and appellee had no children by their marriage.

At time of her second marriage appellee was a woman of wealth and property. The primary source of her wealth was the income from two trusts created by her first husband. Reed Trust Number One was an *inter vivos* trust. Reed Trust Number Two was a testamentary trust. Appellee was the life beneficiary of the income from Reed Trust Number Two with the remainder interest in the Reed children, Roberta and Lucy. The income from Reed Trust Number Two consisted primarily of oil royalties.

When he married appellee, Fagan Dickson was a man of slender means. He was employed as First Assistant in the Attorney General's office with an annual salary of $7,500. He had no other income or property of any significance.

Early in their marriage the parties obtained a written opinion from a tax attorney pertaining to the legal nature of income from the Reed Trusts. That opinion attempted to summarize the law with respect to what was separate property and what was community property. The opinion also suggested how books could be set up to account for each character of property.

In response to the tax opinion, appellant caused to be created a bookkeeping system which he caused to be maintained throughout the marriage. Appellant caused three sets of books to be set up, one for each estate: appellee's separate, appellant's separate and their community. All income was considered to be community income, except for oil royalties. Oil royalties were treated as the separate property of the estate owning the interest. Most of the income enjoyed by the parties resulted from distributions from Reed Trust Number Two. That income was treated as appellee's separate property to the extent it represented oil royalty and as community property to the extent it represented other classes of income.

When an asset belonging to a particular estate was sold, the proceeds from that sale were considered to belong to that estate and were so treated. Any property acquired from the proceeds of the sale was likewise considered and treated by appellant as an asset of that estate. Also, appellant followed the practice of placing real property, which was purchased with appellee's separate funds, in appellee's name as her sole and separate property. During the twenty-seven years of marriage the income from Reed Trust Number Two increased greatly, as did the value of real estate purchased with that income.

In keeping with the tax opinion, the parties opened an account in the Capital National Bank styled the "RPD Bank Account" and accounts in the American National Bank and the Capital National Bank styled the "Mr. and Mrs. Account." Pursuant to the opinion they deposited certain income from Reed Trust Number Two into the "RPD" account and certain income from Reed Trusts Numbers One and Two into the "Mr. and Mrs." account. The parties also opened a bank account termed the "FD" account.

It is fair to conclude that shortly after marriage to appellee Dickson virtually retired from the practice of law. His energies were directed principally toward the handling of his wife's fortune.

Dickson acted as an attorney and advisor to appellee in all transactions involving either her separate account or the community account. He handled all business transactions and arranged for loans. Appellee relied upon him in connection with the execution of all legal instruments, and he tended to the details of delivering and depositing monies in the banks. Appellee relied upon Dickson to maintain the segregation of community and separate funds. Appellant and appellee treated and considered the "RPD" account as appellee's separate property.

In his trial pleading appellant contended that community funds had been used for the benefit of appellee's separate estate, and, as a result, the community estate should be reimbursed from appellee's separate estate. Appellant also claimed that a large part of the wealth which he and Mrs. Dickson had always regarded as her separate property was, in fact, community property. Appellant contended further that appellee's separate property and the community property had been so commingled that segregation of those funds was impractical or impossible. Finally, appellant pleaded that Mrs. Dickson and her attorneys "conspired" to dissolve the marriage and to destroy his community interest in certain shares of stock and real estate.

The court's charge contained eighteen special issues. The jury answered that Dickson undertook to establish, maintain, manage, and supervise a bookkeeping and accounting system for the parties during their marriage to keep segregated the parties' separate and community estates, and that Mrs. Dickson relied upon him to do so. The parties relied upon and undertook to follow the legal opinion prepared by the tax attorney for the purpose of keeping segregated the parties' separate and community estates. During their marriage the parties treated and considered the funds deposited from Reed Trust Number Two into the "RPD" bank account to be the separate property of Mrs. Dickson. The parties, throughout their marriage, treated and considered the funds deposited to the "FD" account from any and all sources to be the separate property of Fagan Dickson. The funds deposited from Reed Trusts Numbers One and Two into the "Mr. and Mrs." account were treated as and considered to be the community property of the parties.

In response to several special issues the jury also answered that nineteen tracts of land, five notes receivable, shares of stock in seven corporations, and municipal bonds with the face value of $718,498 were purchased solely with separate funds or property of Mrs. Dickson.

The district court entered judgment dissolving the marriage and dividing the property. Because the district court's division of the property mainly followed the parties' books and records, appellee received the

great bulk of the property, whereas appellant, by his estimate, received property in the approximate value of $863,133.03. The court departed in only one respect from the books and records and that departure concerned the division of common stock standing in appellant's name in Dickson Properties, Inc., a family corporation.

Although appellant's brief contains fourteen points of error, appellant does not attack any answer of the jury to the special issues. By two points of error appellant says that the district court erred in permitting Sander Shapiro and Frank Ikard, attorneys in the firm of Clark, Thomas, Winters and Shapiro, to testify because those attorneys had allegedly represented him at a time just previous to the divorce proceedings. The Clark firm was one firm of attorneys representing Mrs. Dickson during trial. Appellant claims that Shapiro and Ikard represented him, that they obtained confidential information from him in such representation, and that such information was disclosed by them contrary to appellant's interests.

■ Shapiro and Ikard very likely represented Mrs. Dickson, not appellant. Moreover, it was probably necessary for appellee to call Shapiro and Ikard as witnesses to meet appellant's effort to prove a conspiracy between those attorneys and appellee. However, we will overrule appellant's points of error upon the ground that he waived any complaints he may have had as to the claimed impropriety of attorneys for appellee. There was waiver since Shapiro and Ikard were permitted to testify without objection, *Hill v. Baylor,* 23 Tex. 261 (1859); *Barrera v. Duval County Ranch Company,* 135 S.W.2d 518 (Tex.Civ.App.1939, writ ref'd), and since appellant waited until the trial was well underway, by some twenty-three days, before he filed his motions to disqualify those attorneys and to strike their testimony. *Turner v. Turner,* 385 S.W.2d 230 (Tex.1964).

Appellant complains by points of error three, six, eight, and nine that the district court erred in refusing to submit four requested special issues and three requested instructions. Appellant requested a great cloud of special issues and instructions, two hundred-seventeen in number, which fill one bulky volume of the transcript. Many of the requests were inappropriate and legally immaterial. For example, two requested issues inquired of the jury whether or not it "would be equitable" for property to be divided in a certain manner. Another requested issue inquired whether appellee's treatment of appellant rendered further living together insupportable. This request was made even though the dissolution of the marriage was not even at issue. Another requested issue inquired as to the value of a filing cabinet. Other special issues inquired into the names of certain bank accounts of the parties.

■ Appellant's four requested special issues and three requested instructions were enveloped in a flock of requests in a manner calculated to conceal and with the probable purpose of having them overlooked by the district court. See *Federal Underwriters Exchange v. Walker,* 134 S.W.2d 388, 395 (Tex.Civ.App.1939, writ dism'd). By so obscuring his requested issues and instructions, appellant waived whatever complaints he may have had concerning the refusal of the court to submit the requested issues and instructions. Tex.R.Civ.P. 274, *Metal Structures Corp. v. Plains Textiles, Inc.,* 470 S.W.2d 93 (Tex.Civ.App.1971, writ ref'd n. r. e.); *Hoover v. Barker,* 507 S.W.2d 299 (Tex.Civ.App.1974, writ ref'd n. r. e.). See also *Monsanto Co. v. Milam,* 494 S.W.2d 534 (Tex.1973), for a discussion of the purpose and requirements of Rule 274 in connection with objections to the charge.

By four points of error appellant attacks that part of the judgment awarding appellee the shares of stock of Dickson Properties, Inc., which stood in appellant's name. The award of that stock to appellee is the judgment's only departure from the character of property assigned by the parties' books and records.

■ The issue underlying appellant's points of error is whether the trial court abused its discretion in awarding the stock

to appellee. With respect to the power of the divorce court to divide the property of the parties, Tex.Family Code Ann. § 3.63 (1975) provides that the court shall divide the property ". . . in a manner that the court deems just and right, having due regard for the rights of each party . ." The well established rule is that the court is not required to divide the property equally between the parties. *Carle v. Carle,* 149 Tex. 469, 234 S.W.2d 1002 (1950). It is presumed that the divorce court properly exercised its discretion in the division of the property, and its judgment will not be reversed unless there is a clear abuse of discretion. *Bell v. Bell,* 513 S.W.2d 20 (Tex. 1974).

The basis for appellant's asserted ownership of the stock is as follows. Appellee purchased four tracts of land, about three hundred forty-two acres, near Austin which the parties named "Faro Farms." Appellee took the deeds in her name and those deeds contained recitations that the respective tracts were appellee's separate property. Appellant testified that appellee paid for the land with her separate funds and that he considered the land to be her separate property.

In 1958, appellant asked appellee if she would allow him to have half-ownership in Faro Farms. Appellee testified that on that date appellant was in a "very emotional state" and was "pressing" her "to divide" the land. Appellee finally agreed to do so if appellant would give her a note for one-half of the 1952 purchase price of the lands, and if appellant agreed in writing to return his interest in Faro Farms to her in the event they ever divorced, and if he agreed to devise his interest in the land in equal shares to his son and to appellee's daughters. Appellant gave appellee a note for $78,000 and prepared a partition instrument reciting that the parties were partitioning community property. It is of some moment that after the transaction, but still in 1958, appellant filed a financial statement showing that his interest alone in Faro Farms was worth $254,353.13.

The 1958 Faro Farms transaction was the origin of appellant's asserted ownership of stock in Dickson Properties, Inc., inasmuch as the corporate records show that appellant was issued 4,487 shares of stock by reason of his transfer to the corporation of the one-half interest in Faro Farms.

Though not important to the resolution of the problem, it should be noted that appellant repudiated one of the "conditions" upon which the 1958 transfer was grounded. In 1971, when appellee was critically ill, appellant drafted another will by the apparent terms of which his son would have taken his one-half interest in Faro Farms to the exclusion of the Reed girls.

In any event, and even if Dickson's new will did not violate appellee's supposed "condition," the judgment awarding the corporate stock to Mrs. Dickson was "just and right" in view of the circumstances. One circumstance, other than those surrounding the original transfer of the interest in Faro Farms to appellant, is that much of appellee's separate property was consumed in supporting the family. This is so since Dickson stopped short his practice of law soon after his marriage to appellee. Another such circumstance is that the community estate profited greatly from transactions funded entirely by appellee's separate property, all of which inured ultimately to appellant's benefit. It is a fair conclusion, we think, that nearly all of the community estate, as well as appellant's so-called "separate" property had its origin in appellee's separate property or "special" community property.

Appellant complains by two points of error that the court erred in awarding appellee certain property since that property had been purchased with commingled funds.

For nearly twenty-seven years Dickson was the gentleman on whom appellee built an absolute trust. He acted as her attorney and advisor in all transactions involving either her separate account or the community account. He carried on the business transactions and arranged for loans. Appellee relied upon Dickson in connection with the execution of any and all legal

instruments and he handled the details of delivering and depositing money in banks. Appellee also depended upon Dickson to maintain the segregation of community and separate funds. Whatever commingling occurred from the placing of borrowed funds into the "RPD" account and from the deposition into that account of unidentified "oil payments" was strictly the result of Dickson's doing.

In the exercise of the management and control over appellee's separate property and the community estate, Dickson acted as a trustee for the benefit of appellee. It is axiomatic that a trustee cannot benefit from his own error or wrongdoing. Appellant's points of error will be overruled because the commingling, if any, of the "RPD" account was done by appellant, as trustee or otherwise, and he should not, and will not, be permitted to benefit therefrom. *Giesler v. Giesler*, 309 S.W.2d 949 (Tex.Civ.App.1958, no writ), W. deFuniak & M. Vaughn, *Principles of Community Property*, 125 (2nd Ed. 1971).

The judgment is affirmed.

Affirmed.

O'QUINN, J., not participating.